**NOT RECOMMENDED FOR PUBLICATION**
File Name: 14a0640n.06

No. 13-5875

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **FILED** |
| | ) | Aug 18, 2014 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MERRELL NEAL | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**BEFORE:** MOORE and ROGERS, Circuit Judges; and NIXON, District Judge.[*]

**JOHN T. NIXON, District Judge.** Merrell Neal filed a motion to suppress evidence seized pursuant to a search warrant, arguing probable cause did not exist for the warrant to issue. After the district court denied the motion to suppress, Neal pled guilty to conspiracy to possess with intent to distribute five or more kilograms of cocaine pursuant to a plea agreement, and was sentenced to life imprisonment. Neal appeals (1) the district court's denial of his motion to suppress, (2) the district court's denial of his motion for a hearing under *Delaware v. Franks*, 438 U.S. 154 (1978), and (3) the constitutionality of his sentence of life imprisonment. For the reasons below, we **AFFIRM** Neal's conviction and sentence.

---

[*] The Honorable John T. Nixon, United States District Judge for the Middle District of Tennessee, sitting by designation.

## I.  BACKGROUND

*A.  Factual History*

The affidavit in support of the search warrant application in this case (hereinafter "Affidavit") was sworn by Federal Bureau of Investigation ("FBI") Special Agent Mickey Nocera of the Knoxville Division.  Nocera averred that in the spring of 2011, an unidentified person (hereinafter "CS1") approached Chicago FBI agents; volunteered information regarding persons allegedly engaged in a pipeline operation to transport cocaine between Chicago, Illinois, and Knoxville, Tennessee; and agreed to work with the Chicago FBI as a confidential informant, stating that her motivation in providing assistance was to have her fiancé's sentence for an unrelated narcotics conviction reduced.

CS1 met Neal through a mutual friend in February or March of 2011, and soon after agreed to accompany Neal on multiple road trips from Chicago to Knoxville to visit Neal's brother, Michael Neal.  Though CS1 did not initially know the purpose of the trip, she agreed to go when Neal offered to pay her to ride with him.  Nocera averred that Neal's reason for wanting CS1 to accompany him was that he "believed that a couple traveling together would appear less suspicious to law enforcement."  The Affidavit also stated that CS1 observed that Neal "took a handgun with him on these trips, which he kept in the center consoles inside the passenger compartment of the rental cars."  The following statements are taken from the Affidavit that were drawn from statements CS1 made to the FBI and independent investigation conducted by the FBI.

1.  Neal and CS1's First Two Trips to Knoxville

According to the Affidavit, CS1 and Neal made two trips from Chicago to Knoxville in early April 2011.  On their first trip, on April 1, 2011, Neal and CS1 traveled in a rental car and

used a GPS navigation device to direct them to "800 Beaman Street, Knoxville, Tennessee," which was in the vicinity of their destination.[1] CS1 and Neal arrived at a house on South Beaman Street ("Michael's house") at sometime between 3:00 and 4:00 a.m. Neal pulled into the driveway of the house, retrieved a duffle bag from the trunk of the car, and he and CS1 entered the house. Upon entry, CS1 met Michael and witnessed the Neals remove from Neal's duffle bag three bricks of cocaine wrapped in black plastic with silver tape, and repackage them into smaller quantities. CS1 also witnessed the Neals cook some of the cocaine into crack cocaine and package it for sale, and saw six to eight people come to the house over the next few hours to buy the cocaine and crack cocaine. Once most of the drugs had been sold, Neal and CS1 returned to Chicago, with Neal taking some of the sales proceeds with him and Michael keeping the rest.

According to the Affidavit, Neal and CS1 made their second trip to Knoxville on April 9, 2011, during which they again traveled in a rental car, entered the same address into a GPS, and arrived at Michael's house in the early morning hours. Neal again parked in the driveway and removed a duffle bag from the trunk of the car before he and CS1 entered the house through the same side door. Michael was again in the house upon their arrival, but on this occasion CS1 saw the Neals remove five one-kilogram bricks of cocaine, packaged in the same fashion as the first trip, from the duffle bag. She then allegedly watched the Neals cook a portion of the cocaine into crack, repackage the cocaine and crack cocaine for sale, and sell it to a similar number of people as on the first trip. However during this trip, the Affidavit stated CS1 determined that Neal took $12,000 from the drug proceeds for himself and packaged $168,000 to take back to his cocaine supplier.

---

[1] According to the Affidavit, CS1 believed the address of their final destination was actually 827 or 837 Beaman Street.

2. Nocera's Independent Corroboration of CS1's Statements Regarding the First Two Trips

According to the Affidavit, CS1 described Michael's house as "a single-story green house with a carport and 'junk' in the backyard." Nocera identified a house that he averred closely matched CS1's description, located at 637 South Beaman Street in Knoxville, with green paint near the front door entrance, a carport attached to the back, and a collapsed shed in the backyard that "certainly looks like a pile of junk." On May 3, 2011, Chicago FBI agents showed CS1 photographs of the house located at 637 South Beaman Street and another house at 3236 Lay Avenue, obtained by Knoxville FBI agents that same day. According to the Affidavit, though CS1 "did not immediately recognize the house in the photographs because she did not recall that the house had a front porch," the following day "CS1 identified the [637 South Beaman Street] house in those photographs as the one she visited twice in April 2011."[2]

Between May 4 and 21, 2011, Knoxville FBI agents conducted video surveillance of 637 South Beaman Street and observed a light green Infiniti sedan, resembling a car CS1 had previously identified as belonging to Michael, routinely parked at the house. Nocera learned through Tennessee Department of Safety records that Michael was the registered owner of a green Infiniti Q45 sedan, registered at 3937 Porter Avenue, Knoxville, Tennessee. Agents drove by 3937 Porter Avenue on May 3, 2011, and observed a light green Infiniti parked in the driveway that looked similar to the one observed at 637 South Beaman Street, and bearing a license plate that matched Michael's registration records.

Nocera verified that the phone number CS1 provided for Michael's cell phone was the same number listed for the utilities at 637 South Beaman Street, under the name Michael A.

---

[2] Neal points out that, according to reports produced by Chicago FBI agents after their meetings with CS1 on May 4, 2011, CSI's actual statement was merely that the house at 637 South Beaman Street "could possibly be the Knoxville stash house," but that she did not make a positive identification.

Neal. Nocera also observed, through surveillance footage of 637 South Beaman Street, "an inordinate amount of visitors to [the] house which, based on [his] training and experience, is indicative of a house used for drug trafficking purposes."

Nocera further discovered that Neal had been convicted in 1999 of cocaine conspiracy charges in federal court in Chicago and that Michael had been convicted in 2004 on a felony cocaine charge and a gun charge in Hawkins County, Tennessee, as well as an aggravated firearms charge in Cook County, Illinois. Nocera confirmed that 800 Beaman Street (as well as 827 and 837) is not an address that exists in Knoxville, but hypothesized that entering "800 Beaman Street" into a GPS device would "likely produce directions to a location in the close vicinity of 637 South Beaman Street."

### 3. Neal and CS1's Third Trip to Knoxville

According to the Affidavit, on May 20, 2011, CS1 informed Chicago FBI agents that she had received a phone call from Neal regarding taking a third trip to Knoxville that night. After Neal picked her up, CS1 told agents over the phone that they were traveling in a blue Chevrolet Impala. CS1 continued to update agents as to her location during the trip and FBI agents used electronic surveillance of CS1's phone to track her location as she traveled through Kentucky and Tennessee. At approximately 5:00 a.m. on May 21, 2011, FBI agents observed a blue Chevrolet Impala on Interstate 75 heading South, near Clinton, Tennessee, and confirmed that the Impala's license place was registered to Neal. Nocera then observed, via electronic surveillance, a blue Chevrolet Impala pull into the driveway at 637 South Beaman Street at 5:20 a.m. According to the Affidavit, the driver and a passenger exited the car, the driver retrieved a bag from the trunk, and they both went inside the house.

Based on the warrant application and Affidavit, Magistrate Judge C. Clifford Shirley issued a search warrant for the house at 637 South Beaman Street. CS1 testified that she was only inside Michael's house long enough to use the restroom and sit down on the couch before FBI agents entered the house on May 21, 2011. According to Nocera's separate affidavit in support of the district court complaint, the warrant was executed at approximately 5:35 a.m., and during the search, agents recovered nearly three kilograms of cocaine, approximately sixty grams of crack cocaine, two loaded handguns, and found four people in the house: Michael Neal, Merrell Neal, Brandon Harris, and CS1.

## B. Procedural History

Neal was first arraigned on May 25, 2011. He filed two motions to suppress evidence and a request for a *Franks* hearing on August 15, 2011. Magistrate Judge Shirley held an evidentiary hearing on the motions on September 8, 2011, after which the parties were permitted to file supplemental briefing. On April 13, 2012, Judge Shirley issued a report and recommendation, recommending that the motions be denied. Neal filed an objection to the report, after which the district court adopted the report in part and denied both motions on June 12, 2012.

The district court accepted Neal's guilty plea on June 18, 2012, pursuant to a sealed plea agreement that reserved Neal's right to appeal the denial of his suppression motions. On June 19, 2012, Judge Thomas W. Phillips sentenced Neal to life imprisonment followed by ten years supervised release based on an offense level of 29, a criminal history category of II, and Neal's two prior drug convictions, which qualified him for an enhanced sentence pursuant to 21 U.S.C. §§ 841(b)(1)(A), 851. Judge Phillips noted that because the sentence involved a statutory

mandatory minimum, the court had no discretion to grant Neal's motion for downward departure, as the guidelines were not applicable in his case. Neal timely filed the instant appeal.

## II. MOTIONS TO SUPPRESS

### A. *Standard of Review*

On review of a district court's denial of a motion to suppress, this Court reviews findings of fact for clear error and conclusions of law *de novo*. *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011). A finding of probable cause is a legal conclusion that the Court reviews *de novo*. *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008). An appeal from the denial of a motion to suppress evidence requires us to "consider the evidence in the light most favorable to the government." *United States v. Rodriguez-Suazo*. 346 F.3d 637, 643 (6th Cir. 2003) (internal quotation marks omitted). However, [w]hen the district court itself is a reviewing court, this court owes the district court's conclusions no particular deference." *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (quotation marks and citation omitted).

### B. *Analysis*

#### 1. Standing

Neal's first argument on appeal is that the district courted erred in finding that Neal lacked standing to contest the search warrant at issue. As the government points out, the district court did not address the issue of standing in ruling on the motions to suppress and instead presumed standing existed in order to reach the merits of the motions. As the district court did not determine that Neal did not have standing to challenge the validity of the warrants, the issue of standing is not reviewable at this point. *See United States v. Simpson*, 520 F.3d 531 (6th Cir. 2008) (reviewing only the district court's basis for denying a motion to suppress, not the alternative basis set forth by the magistrate judge but not adopted by the district court).

2. <u>The District Court's Probable Cause Determination</u>

Under the Fourth Amendment, a search warrant may only be issued upon a showing of probable cause, defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (quoting *United States v. Miller*, 314 F.3d 265, 268 (6th Cir. 2002)) (internal quotation marks omitted). In other words, the issuing magistrate must have "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (internal quotation marks omitted), that "a nexus [exists] between the place to be searched and the evidence sought," *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (internal quotation marks omitted).

"[W]here an affidavit is the basis for a probable cause determination, that affidavit 'must provide the magistrate with a substantial basis for determining the existence of probable cause.'" *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). We consider the "totality of the circumstances" when analyzing the sufficiency of a supporting affidavit. *Coffee*, 434 F.3d at 892.

While a magistrate "may rely on hearsay evidence" in determining whether probable cause exists to issue a search warrant, *Helton*, 314 F.3d at 819, when a warrant is issued based on information provided by an informant, our review under the totality of the circumstances must consider the informant's "'veracity, reliability, and basis of knowledge'" to determine "whether an affidavit is sufficient to support a finding of probable cause." *United States v. May*, 399 F.3d 817, 822 (6th Cir. 2005) (quoting *Gates*, 462 U.S. at 230). On the other hand, this Court "do[es] not engage in de novo review of the affidavit," and "'the magistrate's probable cause determination should be afforded great deference.'" *United States v. Rodriguez-Suazo*, 346 F.3d

637, 643 (6th Cir. 2003) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)). "Review of the sufficiency of evidence supporting the probable cause determination is limited to the information contained in the four corners of the affidavit." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010).

Neal argues the district court erred in upholding the magistrate's finding that probable cause existed for the search. Specifically, Neal contends Nocera's Affidavit provided an insufficient basis for probable cause because it did not contain adequate evidence for the magistrate to determine that CS1's statements were reliable or substantially corroborated by law enforcement. The district court found the affidavit adequately supported the veracity and reliability of CS1's statements, even absent independent corroboration, based on (1) CS1 having first-hand knowledge of the facts she supplied, (2) the level of detail she provided in describing her trips with Neal and the drug activities she allegedly witnessed, (3) the fact that her identity was known to Chicago FBI agents, and (4) the fact that the information she relayed amounted to an admission of participation in criminal activity. The district court also found law enforcement's independent corroboration of some of CS1's information sufficient to verify her reliability and veracity, and therefore, based on the totality of the circumstances, a substantial basis existed for the magistrate's probable cause finding.

"'While independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, in the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration.'" *Coffee*, 434 F.3d at 893 (ellipses and brackets omitted) (quoting *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005)). By contrast, an affidavit containing statements of a "known person, named to the magistrate, to whose reliability an officer attests with some detail, [and who] states that he

9

has seen a particular crime and particular evidence, in the recent past," may be sufficient for a finding of probable cause without independent police corroboration. *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc). In short, where an affidavit substantially relies on hearsay statements provided by a confidential informant, probable cause for a warrant to issue depends on whether the reliability of the informant or sufficient independent police corroboration of the informant's statements can be found within the four corners of the affidavit. *See United States v. Woosley*, 361 F.3d 924, 926–27 (6th Cir. 2004); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996).

a. Veracity, Reliability, and Basis of Knowledge of the Confidential Informant

Our precedent suggests that, in determining the reliability of statements provided by an informant under the totality of the circumstances, no single measure of reliability is required for a magistrate to find a confidential informant's statements reliable. Instead, we must balance all potential indicia of reliability present in the affidavit. *See Allen*, 211 F.3d at 975 ("The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."); *Higgins*, 557 F.3d at 389 (noting that while veracity, reliability, and basis of knowledge are all "highly relevant" to a probable cause inquiry, they are "not 'separate and independent requirements to be rigidly exacted in every case'" (quoting *Gates*, 462 U.S. at 230)); *United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006) (finding there is no requirement that an informant be named to the magistrate in order for the magistrate to rely on his or her statements); *May*, 399 F.3d at 823–24 (rejecting the district court's conclusion that an unidentified informant's statements must be corroborated by independent police investigation); *Woosley*, 361 F.3d at 926–27 (citing *Allen* as cautioning against reliance on "formalistic 'tests' that require[] satisfaction of particular elements to support a finding of

probable cause"); *Rodriguez-Suazo*, 346 F.3d at 646 (holding that the veracity, reliability, and basis of knowledge factors must be evaluated under the "fluid totality of the circumstances approach").

This Court has repeatedly held that an affidavit that furnishes details of an informant's track record of providing reliable tips to the affiant can substantiate the informant's credibility, such that other indicia of reliability may not be required when relying on the informant's statements. *See Allen*, 211 F.3d at 976 (no independent corroboration needed where the informant was known to the magistrate and the affiant averred to the informant's reliable tips in previous criminal matters with the same officer over the past five years); *May*, 399 F.3d at 824–25 (informant whose identity was known to the affiant and who the affiant averred had provided assistance in unrelated drug cases was deemed reliable notwithstanding the affiant's failure to disclose his identity to the magistrate); *Helton*, 314 F.3d at 821 (finding statements of an informant may be treated as trustworthy and reliable without corroboration, based on the informant's track record of previously providing information for three searches and sixteen arrests); *United States v. Moore*, 661 F.3d 309, 313 (6th Cir. 2011) (affirming a finding that an informant was deemed reliable based on (1) the informant having previously provided the affiant information that led to two drug seizures, and (2) the informant's statements that he had personally seen drugs at the place to be searched).

However, where the affidavit does not aver facts showing the relationship between the affiant and the informant, or detail the affiant's knowledge regarding the informant providing prior reliable tips that relate to the same type of crimes as the current tip concerns, this Court has generally found that other indicia of reliability must be present to substantiate the informant's statements. *See Frazier*, 423 F.3d at 532 (finding an affidavit failed to establish an informant's

11

reliability where the affiant did not aver (1) the informant's track record for providing reliable information, (2) the length of the relationship between the affiant and the informant, or (3) that the identity of the informant was disclosed to the magistrate). The necessity of the affiant providing further indicia of reliability of his or her informant has been found even in cases where the informant's identity was disclosed to the magistrate and the statements amounted to an admission of criminal conduct. *See Higgins*, 557 F.3d at 389–90 (finding that, although the informant was known to the affiant and the issuing magistrate and admitted participating in a crime, the informant's statements were not reliable because the affiant did not attest to the informant's reliability); *United States v. Hammond*, 351 F.3d 765, 772 (6th Cir. 2003) (finding an informant had not been shown to be reliable where the affiant did not state how long officers knew the informant or whether the affiant knew the informant at all, and the affiant failed to state that the informant was a reliable source or had previously given police reliable information in the past); *Helton*, 314 F.3d at 822 (finding the affidavit did not show the veracity of an anonymous tipster's statements because it did not provide any background information on or basis for believing the tipster, and also failed to describe any track record of accurate tips previously provided).

The Affidavit at issue here does not contain the indicia of reliability needed to find CS1's statements reliable absent corroboration. In his Affidavit, Nocera stated that FBI agents in Chicago were working with CS1, who had approached them offering to provide information about someone transporting cocaine in return for a sentence reduction for a third party.[3] Nocera's only statements in the Affidavit regarding CS1's reliability are as follows:

> CS1 has provided what I believe to be truthful and accurate information
> concerning the people who have been transporting multiple kilograms of cocaine

---

[3] As CS1's Grand Jury testimony reflects, she agreed to volunteer information for the express purpose of earning credit towards an unrelated 26-year prison sentence her fiancé was serving at the time.

from Chicago to Knoxville in recent weeks. As will be detailed in subsequent paragraphs herein, CS1's information is detailed and has been independently corroborated in a number of ways. As a consequence, I believe CS1 to be highly credible.

Nocera did not indicate that he had worked with CS1 in the past or that he was aware of any prior information she had provided law enforcement that was subsequently found to be reliable. To the contrary, there is no evidence in the record that Nocera had ever even met or spoken with CS1 prior to swearing the Affidavit, thus his averments of her reliability and veracity could not have been based on personal knowledge. There is also no indication in the record that the identity of CS1, unnamed in the Affidavit, was disclosed to the magistrate who issued the search warrant. Nocera did not indicate that CS1 had a history of providing reliable information to law enforcement or that she had ever worked as a confidential informant prior to this occasion. Because Nocera's only averments of CS1's reliability are conclusory statements not supported by personal knowledge, they cannot serve as indicia of CS1's reliability.

The government argues CS1's credibility was enhanced because her identity was known to law enforcement and her statements amounted to admissions of participation in criminal activity. However, as in *Higgins*, CS1's admission that she was complicit in criminal activity— even combined with other facts that might substantiate her statements—does not necessarily provide probable cause absent meaningful corroboration. *See* 557 F.3d at 389–90 (explaining that, even though an admission against penal interest is a "'significant, *and sometimes conclusive*, reason for crediting the statements of an informant,'" admission of a crime, even combined with the fact that the informant was known to the affiant and the magistrate, could not alone provide probable cause) (quoting *Armour v. Salisbury*, 492 F.2d 1032, 1035 (6th Cir. 1974)).

13

The only other indicia of reliability the district court identified were the specificity of CS1's statements and the fact that she stated she had firsthand knowledge of the criminal activity she described. However, both prior to and since the Court's en banc decision in *Allen*, members of this Court have discussed the inherent logical flaw in using (1) the level of detail of an informant's story and (2) his or her statement that he or she witnessed criminal activity firsthand, as evidence of the reliability of his or her statements. *See, e.g.*, *United States v. Dyer*, 580 F.3d 386, 394 (6th Cir. 2009) (Moore, J., dissenting) ("It simply cannot be enough to support a search warrant that a previously untested and unknown informant comes to police . . . claims to have witnessed drug activity in another individual's home, and describes innocent facts such as the home's location and design and the alleged drug dealer's physical appearance."); *United States v. Sonagere*, 30 F.3d 51, 54–55 (6th Cir. 1994) (Merritt, J., dissenting) (noting the inherent contradiction in the majority's reliance on "the 'extreme' richness of detail provided by the anonymous 'information source,'" where the affiant stated he had "no basis to judge the source's credibility or reliability" and the police officers did not corroborate the source's statements or develop independent information). By relying primarily on the level of detail provided in statements to assess their reliability, courts are apt to mistake the best storytellers for the most truthful informants. In other words, "[i]f detail is all that is needed to support a search warrant, the Fourth Amendment will no longer be any constraint or check on the issuance of search warrants. Any 'detailed' information, uncorroborated by the police, from virtually any unknown, unreliable source, would support issuance of a search warrant." *Sonagere*, 30 F.3d at 55 (Merritt, J. dissenting). It is important to keep in mind that, as previously explained, the determination of whether probable cause existed at the time the search warrant was issued is confined to the four corners of the warrant application and affidavit, and thus subsequent

confirmation of an informant's statements via evidence seized in the search (or any other activities following the issuance of the warrant) cannot retroactively provide a basis for the reliability of the informant.

In *Frazier*, this Court found insufficient facts existed to support a confidential informant's reliability where the affidavit provided no information regarding (1) previous reliable information provided by the informant; (2) the length of the relationship between the affiant and the informant; or (3) disclosure of the informant's identity to the issuing magistrate. 423 F.3d at 532. Seeming to depart from *Frazier*'s reliance on these indicators, the *Dyer* Court determined that despite a similar lack of any of the three listed indicia of reliability in the affidavit, the informant's reliability was proven based on the facts that the affiant met and travelled with the informant to the location to be searched to corroborate details from the informant's statement, and that the informant had stated that he had witnessed illegal activity on the premises to be searched.[4] 580 F.3d at 391–92.

While it appears *Dyer* may contradict *Frazier*, we need not analyze that question as the facts of this case are clearly distinguishable from *Dyer*. Here, Nocera did not aver any information about meeting or speaking with CS1 as it appears from the record he did not ever meet or speak with her directly. The reliability provided in an officer's ability to analyze the credibility of an informant through in-person interaction or real-time vocal communication was thus entirely absent in this case. As such, even the minimal indicia of reliability determined to be sufficient by the *Dyer* Court was not present here, nor were any of the three indicia of

---

[4] The *Dyer* Court appears to also have distinguished its holding from *Frazier* based on the presence of a nexus between the place to be searched and the evidence sought. 580 F.3d at 391. Cases in this Circuit treat the finding of a nexus between the place to be searched and the evidence sought as a standalone requirement for probable cause, notwithstanding the required finding of reliability or corroboration of a confidential informant. *See e.g., United States v. Moore*, 661 F.3d 309 (6th Cir. 2011). Thus we interpret *Dyer's* finding of a nexus as part of its overall determination that probable cause existed for the search warrant in that case to issue.

reliability held to be determinative in *Frazier*. In fact, the only potential indicia of reliability in this case are CS1's statements that she had witnessed illegal activity on the premises. As the number of uncorroborated details in a statement is not determinative of its accuracy, we hold that reliance on the substance of an unproven statement to determine its reliability cannot substantiate an informant's credibility. Accordingly, here the Chicago FBI agents' knowledge of CS1's identity and the nature and detail of CS1's statements do not provide sufficient indicia of reliability to support a finding of probable cause without independent police corroboration.

b. Independent Police Corroboration of the Confidential Informant's Statements

"[A]n affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *Woosley*, 361 F.3d at 927 (citing *Gates*, 462 U.S. at 241–45).

The district court determined that the following facts discovered by Nocera's investigation corroborated facts given by CS1:

- The house at 637 South Beaman Street closely matched CS1's description of Michael's house;

- The address "800 Beaman Street" does not actually exist, as indicated by CS1;

- The utilities for 637 South Beaman Street were in the name Michael A. Neal, and the phone number on the account matched the phone number CS1 supplied for Michael;

- A light green Infiniti sedan matching the description given by CS1 was registered to Michael, though not at 637 South Beaman Street;

- A light green Infiniti was observed at the address associated with the vehicle's registration, bearing the license plate of a vehicle registered to Michael;

- Both Neal brothers had prior felony convictions involving cocaine;

16

- Surveillance of 637 South Beaman Street between May 4 and 20, 2011, revealed Michael's light green Infiniti routinely parked at the house, as well as an "inordinate amount of visitors" coming and going from the house;

- Electronic tracking on May 20 and 21, 2011, showed CS1 traveling from Chicago to Knoxville;

- Agents observed a blue Chevrolet Impala traveling on the highway near Clinton, Tennessee, in the early morning hours of May 21, 2011, bearing a license plate registered to Neal;

- Nocera observed, through surveillance, a blue Impala pull into the driveway of 637 South Beaman Street at approximately 5:20 a.m. on May 21, 2011, at which time the driver and a passenger got out of the car, the driver retrieved a bag from the trunk, and the two went into the house.

While none of the corroborating information includes any observations of criminal activity, the district court determined this information was a sufficient basis for probable cause because (1) it was adequate to establish CS1's reliability and veracity, and (2) it established a substantial basis for the magistrate's probable cause determination because of the suspicion attached to the corroborated acts. The district court also concluded that, the similarity between the events observed by agents on May 20–21, 2011, and CS1's statements regarding her first two trips with Neal served to fully corroborate the first two trips. Specifically, the district court found the agents' observations of the May 20–21 trip confirmed that the first two trips CS1 stated she made with Neal actually occurred.

The corroborating facts the district court identified comprise only non-incriminating facts (aside from Nocera's observation of what he opines was a suspicious number of people coming to and going from the house).[5] Further, it was error for the district court to hold that CS1's

---

[5] Corroborated facts include: Michael's phone number and name being associated with the utilities for the house at 637 South Beaman Street; Michael's ownership of a light green Infiniti; "800," "827," and "837" Beaman Street not being addresses that exist in Knoxville; Neal's ownership of a blue Chervolet Impala; both Neal and Michael's prior felony convictions involving cocaine; CS1's cell phone being near Berea, Kentucky, and near Pioneer, Tennessee on the morning of May 21, 2011; and Neal's Impala driving on a highway south of Clinton, Tennessee on the morning of May 21, 2011.

statements regarding the third trip could serve to corroborate the first two trips. In fact, the record is entirely bereft of independent corroboration of the first two trips—at no point did agents obtain any information to verify the occurrence of the first two trips outside of CS1's statements that they occurred. As the evidence in the record does not show the reliability of CS1's statements and does not corroborate the first two trips, it necessarily follows that CS1's declaration that these trips occurred is insufficient to provide corroboration of the trips themselves.

The district court relied on *Gates* for the proposition that corroboration of innocent facts can provide a sufficient basis for finding probable cause. However, in *Gates*, and the case upon which it relies, *Draper v. United States*, 358 U.S. 307 (1959), the confidential tips received by police described in detail activities that were to take place in the *future*, which allowed police to "personally verif[y] every facet of the information" contained in the tips as the events unfolded, prior to seeking a search warrant. *Gates*, 462 U.S. at 242–44 (citing *Draper*, 358 U.S. at 313). By contrast here, CS1 did not provide any information regarding future events that agents could verify through independent observation to bolster the reliability of the rest of CS1's statements.[6] Instead, CS1 only provided information regarding past events and one event as it occurred.

The government argues that the veracity and reliability of CS1's statements were proved by agents observing CS1 perform certain actions, similar to agents in *United States v. Smith*, 337 F. App'x 500, 504–05 (6th Cir. 2009), and *United States v. Henry*, 299 F. App'x 484, 487–88 (6th Cir. 2008). However, *Smith* and *Henry* both relied on *Coffee* and involved the narrow

---

[6] Though the district court states that the similarity in CS1's statements regarding the first two trips and the agents' observations of the third trip supports the veracity of the statements, the only facts that were independently corroborated with respect to the third trip are: (1) that CS1's phone was tracked at certain locations in Kentucky and Tennessee, (2) CS1's description of the vehicle she traveled in, and (3) the arrival of a vehicle with the same description at 637 Beaman Street. Additionally, even though CS1 correctly informed agents that she was in Neal's blue Impala after the trip started, even this fact is different from her description of the first two trips in which she stated they drove in rental cars.

issue of controlled drug purchases not present in this case. In *Coffee*, this Court held that an informant's statement that he had made previous drug purchases from the suspect could be independently corroborated through having the informant make a police-monitored controlled buy. 434 F.3d at 894–95. Similarly, in *Jackson* the Court explained that, though details regarding the informant's reliability based on previous encounters were lacking, controlled buys allowed the magistrate to base a probable cause finding on the affiant's personal knowledge and observations of the informant, rather than the informant's hearsay statements. 470 F.3d at 308.

Applying that reasoning to Nocera's personal knowledge and observations, we are left with only the following facts: a car registered to Neal made a trip to a house his brother occupied;[7] such house was frequented by a number of visitors; Michael owned a light green Infiniti that was registered at a different address; CS1's cell phone was electronically tracked in Kentucky and Tennessee prior to a blue Impala arriving at 637 South Beaman Street; and both Neal brothers had prior convictions involving cocaine. These non-incriminating facts are easily distinguishable from the controlled drug purchases observed by law enforcement in *Coffee*, *Smith*, *Henry*, and *Jackson*, both because they do not reveal any criminal activity,[8] and because they are attenuated from the substance of CS1's statements regarding the previous trips she and Neal made to Knoxville for the purpose of cooking, packaging, and distributing narcotics.

This Court has previously found even more concrete police corroboration than what was provided in this case to be insufficient for finding probable cause. In *Higgins*, the Court found the following verified facts were insufficient corroboration of an informant's statements for a

---

[7] Nocera did not identify Neal or CS1 as the people he observed getting out of the blue Impala at 637 South Beaman Street. However, as it appears from the record that Nocera never met CS1, it is logical that he could not actually identify her as one of the people he saw at the house on May 21, 2011. Nocera also did not verify that the car that arrived at the Beaman Street house had the same license plate number as the car seen on the highway that was verified as registered to Neal.

[8] We note that this Court has previously determined a defendant's criminal record is irrelevant to the determination of whether a location presently contains evidence of a crime. *See Higgins*, 557, F.3d at 390.

probable cause finding: (1) passengers in the informant's car confirmed that the informant had bought drugs from the suspect, (2) officers verified the address the informant gave and the motorcycle the informant described as belonging to the suspect, and (3) officers discovered the suspect had two prior convictions for narcotics trafficking.[9] 557 F.3d at 390. In *Frazier*, the Court found the corroborating facts insufficient where the affiant verified the informant's statements that the defendant would come and go from a specific address in an expensive vehicle, and that the defendant was in constant contact over the phone with known drug dealers. 423 F.3d at 532. In *Hammond* the Court found insufficient corroboration where the affiant verified the defendant's address and the details provided about the exterior of the home, and independently learned the following information that confirmed the informant's statements: (1) numerous complaints had been made regarding a potential marijuana growing operation at the defendant's residence, (2) an unusually high amount of power consumption was coming from what was listed as a second building on the defendant's property, and (3) results of an Aerial Thermal Image scan of defendant's property were consistent with other indoor growing operations investigated by the affiant. 351 F.3d at 768–69, 773.

Because the corroborated evidence in this case amounted to no more than innocent facts and did not include verification of future activities CS1 stated would happen, we find sufficient corroboration did not exist to provide a substantial basis for the magistrate's probable cause finding. Nocera could not personally confirm CS1's reliability as he never met or spoke with her and he did not provide sufficient corroboration of her statements beyond largely innocent facts. As such, the magistrate did not have a substantial basis to find probable cause existed based on

---

[9] In *Higgins*, greater indicia of reliability also existed than are present in this case: the informant was known to the affiant and the issuing magistrate, and had admitted to buying drugs from the defendant. 557 F.3d at 389–90.

the four corners of the affidavit and we thus conclude the district court erred in determining the warrant was supported by probable cause.

> 2. <u>Good Faith Exception to Suppression of Evidence Based on Lack of Probable Cause</u>

Upon invalidating a search warrant that was issued without probable cause, we next assess whether the officers who executed the warrant relied in good faith on its validity, to determine whether evidence obtained pursuant to the invalid warrant should have been suppressed. The government argues that the good faith exception should apply in this case because the Affidavit was sufficiently detailed that officers could have objectively relied upon it in good faith to execute the search. The district court declined to rule on the applicability of the good faith exception after determining the warrant was supported by probable cause. Although as a general rule "a federal appellate court does not consider an issue not passed upon below," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008), in our discretion we examine the issue of good faith because "the issue is presented with sufficient clarity and completeness" to be resolved at this time, *see United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010) (internal quotation marks omitted).

The Supreme Court created the good faith exception to the exclusionary rule in *United States v. Leon*, 468 U.S. 897, 922 (1984), explaining that the deterrent effect of excluding evidence obtained through unlawful conduct is not furthered by "suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant. An officer's reliance on a deficient warrant is not in good faith where "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23. The Court carved out four circumstances in which an officer's reliance on a subsequently invalidated warrant cannot be considered objectively reasonable:

21

> first, if the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;" second, if "the issuing magistrate wholly abandoned his judicial role;" third, if the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or in other words, where "the warrant application was supported by [nothing] more than a 'bare bones' affidavit," and, fourth, if the "warrant may be so facially deficient—i.e., failing to particularize the place to be searched or the things to be seized."

*Weaver*, 99 F.3d at 1380 (citations omitted) (quoting *Leon*, 468 U.S. at 914–15, 923). We find the officers here acted in good faith as none of the exceptions to the good faith doctrine apply.

First, as explained in more detail in Section III, Neal failed to make even a preliminary showing that Nocera knowingly included any false statements in the Affidavit. Thus, there is no question of whether false information in the Affidavit misled the issuing magistrate.

Second, we give "great deference" to a magistrate's determination, *Allen*, 211 F.3d at 973 (internal quotation marks omitted), and unless the magistrate "fail[s] to 'manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application' and . . . acts instead as 'an adjunct law enforcement officer,'" we cannot say the magistrate wholly abandoned his judicial role, *Leon*, 468 U.S. at 914 (quoting *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–27 (1979)). The magistrate's responsibility is to "make a practical, common-sense decision," based on all of the circumstances in the affidavit presented, whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. No evidence has been presented and no argument advanced in this case that the issuing magistrate abandoned his role as a neutral arbiter in issuing the warrant.

Third, the standard for finding good faith is less demanding than the "substantial basis" test necessary for probable cause in assessing the sufficiency of an affidavit. Suppression of evidence seized under an invalidated warrant will only be upheld under good faith analysis if the supporting affidavit "is so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable." *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004) (quoting *Carpenter*, 360 F.3d at 595) (internal quotation marks omitted). Thus, it is entirely possible that an affidavit contains "a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause." *Carpenter*, 360 F.3d at 596. This analysis requires examination of only the four corners of the affidavit, and we will only find the affidavit is "bare bones" if it "states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Weaver*, 99 F.3d at 1378.

While the Affidavit in this case did not meet the standard necessary to provide probable cause for the search, Nocera did corroborate enough specific facts (void of criminal behavior as they may be) to establish a minimal nexus between the place to be searched and the potential for criminal activity. *See Carpenter*, 360 F.3d at 595–96. Specifically, Nocera determined that Michael was associated with the Beaman Street house by learning that the utilities for the house were in his name and that a car identical to one registered to Michael was frequently at the house. Thus, an objective officer could reasonably rely on the Affidavit to believe probable cause existed for the warrant to issue.

Similarly, we decline to find that the warrant was so facially deficient that the executing officers could not reasonably presume it to be valid as there is no contention that the warrant "fail[ed] to particularize the place to be searched or the things to be seized." *Leon*, 468 U.S. at 923. The warrant application and Affidavit provided the physical location of the house and vehicle to be searched, as well as a detailed description of the house, photographs of the outside of the house, and driving directions to reach the location. Additionally, the Affidavit explicitly

listed the items sought from the house and the car, including: powder cocaine and crack cocaine; scales; baggies and other packaging materials; diluting or cutting agents used to increase the volume of cocaine for distribution; utensils, containers, and appliances used to make crack cocaine, including Pyrex containers and a blender; firearms and ammunition; United States currency; money counters; cellular telephones; documentary evidence including address books, ledgers, notes, photographs, and documents showing dominion, control, or occupancy of the Beaman Street house; a GPS device; gas and food receipts; rental agreements; and other documentary evidence possessed by Neal.

Because we find no circumstances exist in this case to render an objective officer's reliance on the subsequently invalidated warrant unreasonable, the good faith exception applies, and the evidence seized pursuant to the warrant was properly admitted against Neal.

### III. MOTION FOR A *FRANKS* HEARING

This Court reviews a district court's denial of a defendant's motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), "using the same standard as for the denial of a motion to suppress; that is, [the Court] review[s] for clear error the district court's factual findings, and . . . review[s] de novo the district court's conclusions of law." *United States v. Brown*, 732 F.3d 569, 574–75 (6th Cir. 2013).

*Franks* provides that a search warrant is invalid under the Fourth Amendment when "the supporting affidavit contains a statement, necessary to the finding of probable cause, that is later demonstrated to be false and included by an affiant knowingly and intentionally, or with a reckless disregard for the truth." *United States v. Duval*, 742 F.3d 246, 250 (6th Cir. 2014). "*Franks* also extends to circumstances in which an officer omits evidence in a search-warrant affidavit that is critical to determining the existence of probable cause." *Id.* at 251 (citing

24

*Carpenter*, 360 F.3d at 596 ("[T]his court has recognized that material omissions are not immune from inquiry under *Franks*.")).

To be entitled to a *Franks* hearing based on an affirmative misstatement, a defendant must "make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. Although material omissions from an affidavit may also provide a basis for a *Franks* hearing, "[t]his court has repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008); *see also Carpenter*, 360 F.3d at 596–97 ("But to be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have *undermined* the showing of probable cause.").

Neal raises two arguments as to why it was reversible error for the district court to deny his motion for a *Franks* hearing. First, he argues Nocera's averment of the veracity of CS1's statements and CS1's credibility amounted to an affirmative misstatement, given that Nocera had never met or spoken with CS1. Second, Neal argues Nocera's omission of a statement made by Chicago FBI agent Danny Price, indicating that Price doubted CS1's veracity, amounted to a material omission. Neal contends that, had the issuing magistrate known these two facts at the time he reviewed the Affidavit, he might not have determined that probable cause existed for the search warrant to issue. While Neal admits that he does not know whether Nocera was aware of Price's statements at the time of the Affidavit, Neal argues he was entitled to a *Franks* hearing to determine whether (1) Chicago FBI agents had "laundered information" about CS1 to make her

seem more credible to Nocera than she actually was, or (2) Nocera knew about Price's doubts, and thus recklessly disregarded their truth in omitting them from his Affidavit. Based on either premise, Neal argues the misstatement or material omission amounted to a reckless disregard for the truth on the part of investigating officers in this case, entitling him to a *Franks* hearing.

The district court held that, with respect to the allegedly false statement by Nocera about CS1's veracity, Neal was not entitled to a *Franks* hearing because he did not make a substantial preliminary showing that the statement was indeed false or made with a reckless disregard for the truth. The court instead found that Nocera's corroboration of facts in CS1's statement provided him adequate grounds to state his beliefs regarding her credibility. With regard to the alleged material omission, the district court determined that the omission of information regarding Price's skepticism of CS1's veracity was not material to the magistrate's probable cause finding. Moreover Neal did not present any evidence that the omission was made with a reckless disregard for the truth.

With respect to the first prong of the *Franks* analysis, Neal's argument regarding both Nocera's alleged misstatement and his omission do not identify sufficient facts indicating Nocera acted with reckless disregard for the truth. Although Neal does offer proof that, at one point, Price doubted CS1's veracity, he fails to acknowledge that Price subsequently filed a separate report explaining that his previous misreading of CS1's telephone records was the sole basis for his doubting CS1's truthfulness. Moreover, Neal fails to establish or even assert that Nocera's alleged misstatement or material omission was necessary for the magistrate's probable cause determination.

We note that Neal has pointed to numerous discrepancies between the Affidavit and (1) the reports of Chicago FBI agents, (2) CS1's Grand Jury testimony, and (3) Nocera's subsequent affidavit in support of the complaint that we recognize as potentially problematic.

While the number of inconsistencies and apparent contradictions between the Affidavit and Nocera's second sworn statement of the same day and CS1's Grand Jury testimony given just three days after the Affidavit is unsettling, the appearance of inconsistent testimony *after* the affiant has given a statement does not show that the affiant acted with reckless disregard for the truth. *See United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001). Accordingly the district court did not err in deciding that Neal was not entitled to a *Franks* hearing.

## IV. CONSTITUTIONALITY OF SENTENCE

This Court reviews constitutional challenges to a sentence de novo. *Graham*, 622 F.3d 445, 452 (6th Cir. 2010) ("*Graham II*"). Neal argues his life sentence under 21 U.S.C. § 841(b)(1)(A) violates both the Eighth and Fourteenth Amendments; specifically, Neal contends the sentence contravenes of the Fourteenth Amendment Equal Protection Clause and Eighth Amendment prohibition on cruel and unusual punishment. Neal's argument is based entirely on sentencing disparities—nationally, regionally, and within this case—in claiming his sentence was unconstitutional.[10] In particular, Neal argues that it should "raise the curiosity of the court" that he received a life-sentence while his co-defendant, with an allegedly similar criminal background, received a sentence of 120 months.

Under 21 U.S.C. § 851, when seeking a sentencing enhancement based on prior drug convictions, the Government must file an information with the district court prior to trial,

---

[10] Neal mentions in passing that one of his underlying convictions was based on an offense he committed at 17 years old, although he was tried and sentenced as an adult. However, he does not appear to assert this as a basis for challenging his sentence. Regardless, this Court has already explicitly rejected this exact argument. *Graham II*, 622 F.3d at 461–64.

"stating in writing the previous convictions to be relied upon." Prosecutors are afforded discretion in determining whether to seek such enhancements and are limited only in that they may not base the decision on "improper factors." *United States v. LaBonte*, 520 U.S. 751, 761–62 (1997) ("Insofar as prosecutors, as a practical matter, may be able to determine whether a particular defendant will be subject to the enhanced statutory maximum, any such discretion would be similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect."). To the extent Neal's argument relies upon § 851 granting improper discretion to prosecutors, his argument is foreclosed by both *LaBonte* and this Court's decision in *United States v. Crayton*, 357 F.3d 560, 572 (6th Cir. 2004), which held that § 851 was not an improper delegation of power to the executive branch because "[t]he discretion a prosecutor exercises in determining whether an enhanced statutory maximum applies under § 851 is similar to the initial discretion the prosecutor has in deciding which charges to bring against a defendant, discretion that is obviously constitutional."

Similarly, Neal's arguments that a disparity between his sentence and those of either other defendants around the country or his co-defendant amounts to a violation of his Eighth and Fourteenth Amendment rights fails to establish constitutional violations under the well-established law of this Court. As to the Eighth Amendment's prohibition of cruel and unusual punishment, the Sixth Circuit has clearly adopted the "narrow proportionality principle" set forth in the plurality opinion of *Harmelin v. Michigan*, 501 U.S. 957, 959 (1991). *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). Accordingly, "only an extreme disparity between crime and sentence offends the Eighth Amendment." *Id.*; *United States v. Odeneal*, 517 F.3d 406, 414 (6th Cir. 2008). Under this standard, this Court has repeatedly found life sentences pursuant to § 841(b)(1)(A), based on two previous drug convictions, not to be "grossly

disproportionate." *E.g.*, *Graham II*, 622 F.3d at 452–54; *United States v. Flowal*, 163 F.3d 956, 963–64 (6th Cir. 1998); *United States v. Hill*, 30 F.3d 48, 50–51 (6th Cir. 1994); *see also United States v. Thornton*, 609 F.3d 373, 378–79 (6th Cir. 2010). Moreover, as to the Fourteenth Amendment's guaranty of equal protection, Neal's argument regarding the disparate nature of the sentences imposed on him and his co-defendant is similarly unavailing. This Court has previously concluded that the Constitution does not require proportionality in sentencing among co-defendants. *Odeneal*, 517 F.3d at 414 (citing *United States v. Layne*, 325 F.3d 464, 474 (6th Cir. 2003)).

Neal has failed to acknowledge this binding precedent in his briefing, much less attempt to distinguish his case. Instead, Neal has focused mostly on the factual findings made by a district court judge in the Northern District of Iowa regarding regional sentencing disparities based on prosecutors' use of § 851. *See United States v. Young*, 960 F. Supp. 2d 881 (N.D. Iowa 2013). Regardless of the effect of the factual findings Neal has relied upon,[11] *Young* presented a different situation than we are confronted with here. In *Young*, the defendant was arguably subject to a doubling of his mandatory minimum under § 841 based on having one prior conviction for a drug offense. *Young*, 960 F. Supp. 2d at 883. However, based upon the *Young* court's recalculation of his criminal history, the defendant was no longer subject to the mandatory minimum at issue and, thus, no longer eligible for doubling under § 841. *Id.* at 883–84. The remainder of the *Young* opinion was devoted to a discussion of the disparities in the use

---

[11] Neal has requested this panel take judicial notice of the *Young* decision. However, courts ordinarily may not take judicial notice of the factual findings of another court. *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) (citing cases from various circuits that hold "a court cannot take judicial notice of the factual findings of another court"); *see also United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("Generally, we will not consider facts outside the record developed before the district court. However, we may take notice of proceedings in other courts . . . if those proceedings have a *direct relation* to matters at issue.") (internal quotation marks and citations omitted) (emphasis added). While courts may take judicial notice of government statistics such as United States census data, *see Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir. 2011), here Neal's argument, based on the statistical findings of another court, is foreclosed by our precedent.

of § 851 enhancements by prosecutors across the country.  *Id.* at 885–909.  While *Young* may be instructive by revealing such disparities, it provides no legal basis for vacating Neal's sentence.

## V.  CONCLUSION

For the reasons above we **AFFIRM** the district court's denial of Neal's motions to suppress, denial of Neal's motion for a *Franks* hearing, and the sentence imposed on Neal.

**KAREN NELSON MOORE, Circuit Judge, concurring.** It is a close call whether Agent Nocera's independent corroboration of the informant's tips, in combination with the other information included in the affidavit, was sufficient to support a finding of probable cause. I do not reach a conclusion on whether probable cause existed to support the warrant, however, because I agree that the good-faith exception to the exclusionary rule applies. Accordingly, I concur in the lead opinion with respect to the discussion of the good-faith exception in Part II, the *Franks* issue in Part III, and the sentencing issue in Part IV.

**Rogers, Circuit Judge, concurring in the judgment.** This case is a far cry from Judge Moore's noted hypothetical in *United States v. Dyer*, 580 F.3d 386 (6th Cir. 2009), and probable cause existed to issue the search warrant authorizing agents to search Mr. Neal's house at 637 South Beaman Street. Through an extensive investigation that included video surveillance of the house for more than two weeks, Agent Nocera independently corroborated the details that the informant had provided to law enforcement officials. In addition, Agent Nocera averred that "there has been an inordinate amount of visitors to this house which, based on my training and experience, is indicative of a house used for drug trafficking purposes. This is particularly true of a house, such as this one, which does not appear to be used as a residence." Although many of the facts that Agent Nocera corroborated are not inherently incriminating, corroboration of even non-incriminating facts can be sufficient to establish probable cause. *See Illinois v. Gates*, 462 U.S. 213, 244 (1983). Under a totality of the circumstances analysis, Agent Nocera's substantial corroboration of the informant's statements supports the conclusion that the U.S. Magistrate Judge's warrant was based on probable cause.

However, because the good faith exception to the exclusionary rule applies in this case for the reasons set forth in the majority's opinion, it is unnecessary to reach the issue of whether probable cause exists. Therefore, I concur in the judgment.