NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0720n.06

No. 10-2150

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Oct 19, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Plaintiff-Appellee,* | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| JAMAIL ARNOLD | ) | O P I N I O N |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:     COLE, ROGERS, and GRIFFIN, Circuit Judges.

COLE, Circuit Judge.  Defendant-Appellant Jamail Arnold appeals the denial of his motion to suppress the introduction of crack cocaine and other related evidence found during a warrantless search of his car as well as drug-related evidence found in his girlfriend's apartment pursuant to a warrant.  Arnold pleaded guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and one count of distribution of a controlled substance, in violation of 21 U.S.C. § 841, but reserved his right to challenge the denial of the motion to suppress.  Arnold argues that the police did not have reasonable suspicion or probable cause to stop and search his vehicle and, therefore, that the two searches violated the Fourth Amendment.  We **AFFIRM** the district court's denial of the motion to suppress.

I.

On March 13, 2008, an anonymous informant contacted the Jackson Narcotics Enforcement Team ("JNET") to report that Arnold was selling crack cocaine in Jackson, Michigan. The informant told JNET officers that Arnold was driving up and down Francis Street selling drugs out of his burgundy mid-1980s Monte Carlo. And more specifically, the informant reported that Arnold was selling drugs at the Sunoco station at Francis Street and Wall Street and was spending time at an address on Mason Street. This informant had previously contacted JNET to report Arnold's drug activity, and officers had already placed Arnold under surveillance. Before March 2008, based on information the informant provided, JNET officers had already corroborated that Arnold was on parole, used three different addresses to distribute drugs, and drove a burgundy Ford Expedition.

To corroborate the informant's tip, JNET Deputy Scott Watson drove to the Francis Street and Wall Street area. Watson found the burgundy Monte Carlo parked on Wall Street and saw a group of people standing near the open trunk. He could not, however, identify Arnold among the people surrounding the trunk. Later, Watson and Detective Todd Pelletier found the Monte Carlo parked in a driveway on Mason Street. And soon afterwards, Watson and Pelletier again saw Arnold driving on Francis Street.

After losing Arnold's car in traffic, Watson and Pelletier met the informant in person to arrange a controlled buy. Watson signed her up as a registered confidential informant and then had her call Arnold. She called a number saved as "Jamail" in her cell phone and put the call on speaker phone so both officers could hear the conversation. The informant asked Arnold if she could "get

- 2 -

hooked up" because she had friends coming to town, and Arnold told her that he had everything with him, so she should just call him when she was ready to meet.

Later the same day, with additional JNET officers stationed throughout the area, Watson and Pelletier met up with the informant and had her call Arnold again. Once again, she called the number saved as "Jamail" in her cell phone and placed the phone on speaker so the officers could listen. She told Arnold that her friends had arrived and they were ready. Arnold said he would "be right over" and they arranged to meet near Union Street and Fourth Street.

JNET officer Adam Williams spotted the Monte Carlo driving in the direction of the proposed drug deal and directed Sergeant Kevin Hiller, who was driving a marked police car, to pull over Arnold. Hiller turned on his overhead lights and Arnold pulled over. Hiller then approached the Monte Carlo and asked Arnold to turn the car off and step out of the vehicle. While Hiller and Williams attempted to frisk Arnold for weapons, additional JNET officers arrived at the scene. Arnold was allegedly uncooperative during the pat down and was placed under arrest for disorderly conduct.

JNET officers searched the interior of Arnold's car but did not find any contraband. In the trunk, however, officers found a grocery bag filled with crack cocaine, powder cocaine, digital scales, and sandwich bags. Based on this contraband, officers went to locate Arnold's other known vehicles, believing they would contain more drug evidence. Later that evening, officers found Arnold's girlfriend, Camille Truman, in Arnold's Ford Expedition. Truman told police that she accompanied Arnold and a friend to Detroit the previous evening, where Arnold and the friend went inside a building for less than half an hour before they returned to Jackson. Truman also informed

police that Arnold had been living in her apartment for the past few days. Based on all this information, police secured a search warrant for Truman's apartment. In the apartment, police seized two handguns belonging to Arnold as well as more drug-related contraband.

Arnold was subsequently prosecuted for possession with intent to distribute crack cocaine and being a felon in possession of a firearm. Arnold moved to suppress the drugs and guns based on an unconstitutional stop and search of his vehicle. After the district court denied Arnold's motion to suppress, Arnold entered a conditional guilty plea maintaining his right to appeal the denial of the suppression motion. Arnold was later sentenced to 120 months in prison and three years of supervised release. Arnold filed a timely appeal.

## II.

## A.

In reviewing a district court's denial of a motion to suppress, this Court reviews the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004). Although the standard of review on the probable cause determination is de novo, because the district court had the advantage of observing witness testimony, "'due weight' should be given to the inferences drawn from the facts . . . ." *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996)). Furthermore, this Court must view the evidence "in a light most likely to support the decision of the district court." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). However, a district court's "'denial of a motion to suppress will be affirmed on appeal if proper for

any reason[,]' even one not relied upon by that court." *United States v. Garza*, 10 F.3d 1241, 1245

(6th Cir. 1993) (alteration in original) (quoting *United States v. Barrett*, 890 F.2d 855, 860 (6th Cir.

1989) (abrogated on other grounds)).

The Fourth Amendment provides the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend.

IV. The automobile exception permits police to stop and search a car without a warrant if they have

probable cause to believe it contains contraband. *Carroll v. United States,* 267 U.S. 132, 149 (1925).

An automobile search is not "unreasonable if based on facts that would justify the issuance of a

warrant, even though a warrant has not actually been obtained." *United States v. Ross*, 456 U.S. 798,

809 (1982). A warrantless vehicle search for contraband, therefore, satisfies constitutional standards

if police have sufficient information to support a finding of probable cause. The scope of a

warrantless automobile search is "no narrower—and no broader—than the scope of a search

authorized by a warrant supported by probable cause," therefore, police may search only in areas and

containers where the contraband could be found. *Id.* at 823.

Whether the police have probable cause to support a warrantless automobile exception search

requires an examination of the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 233

(1983). In looking at all relevant facts, the question becomes whether the police established "a fair

probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238;

*Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998). "This totality of the circumstances

analysis includes a realistic assessment of the situation from a law enforcement officer's

perspective," *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993), and allows officers to make

inferences based on their law enforcement training and background. *Cf. United States v. Cortez*, 449 U.S. 411, 418 (1981). Additionally, to form this particularized suspicion, police may rely on a confidential informant's tip if it is "sufficiently detailed and corroborated by the independent investigation of law enforcement officers." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998).

**B.**

In determining the constitutionality of the stop, the district court focused its analysis on reasonable suspicion. However, probable cause existed at the time of the initial stop, and so reasonable suspicion analysis is unnecessary. Arnold argues that both the warrantless vehicle search and the warrant search of his girlfriend's apartment violated the Fourth Amendment. Arnold contends that the police did not have probable cause to stop and search his vehicle, and so the resulting automobile search was unconstitutional and the evidence must be suppressed. He further argues that evidence seized from his girlfriend's apartment should also be suppressed as fruit of the poisonous tree because the search warrant relied on evidence found during the allegedly unconstitutional vehicle search.

At the time police stopped and searched Arnold's vehicle, they had probable cause to believe Arnold's car contained contraband and were, therefore, justified in their warrantless search. The police could point to a variety of specific facts to establish a fair probability that Arnold's trunk contained contraband: the confidential informant's tips and corroboration thereof, the observation of people surrounding Arnold's open trunk, the informant's arrangement of a controlled buy over the phone, and Arnold's drive to the proposed drug deal location.

Prior to March 13, 2008, the police independently investigated and verified the informant's tips, including the kind of car Arnold drove, the addresses associated with Arnold, and that he was, at that time, on parole. On March 13, 2008, police also verified the informant's allegations that Arnold was driving in the Francis Street area in a burgundy Monte Carlo. Not only did police spot the Monte Carlo on four separate occasions in the area the informant described, but they also observed the car parked in the area with its trunk open and a group of people surrounding it, suggesting a drug sale. After verifying these initial tips, Watson and Pelletier observed two telephone conversations between the informant and Arnold arranging a controlled buy. The officers heard Arnold agree to "hook up" the informant, which given their careers in drug investigations and familiarity with drug terminology, lead them to conclude that Arnold agreed to sell drugs to the informant. *See Cortez*, 449 U.S. at 418; *United States v. Cooper*, 868 F.2d 1505, 1513 (6th Cir. 1989) ("The use of jargon and code words 'is a frequent practice in narcotic dealings.'") And police are permitted to draw inferences to interpret these code words based on their law enforcement experience and may make "deductions that might well elude the untrained person." *Cortez*, 449 U.S. at 418. According to Watson, in his experience, the term "hook up" is commonly used to refer to drugs, and he was permitted to rely on that knowledge in forming probable cause. Finally, following the second phone call, officers observed Arnold driving to the location of the proposed drug deal.

Viewing these facts within the totality of the circumstances, the police did have a reasonable belief that contraband would be found in a particularized location. Police had a reason to believe drugs would be found in Arnold's trunk because of the corroboration of the informant's tips, the officer's first hand observation of a phone call arranging a controlled buy, the crowd gathering

around the Monte Carlo's trunk, and Arnold driving to the proposed drug deal. All of these facts, when taken together, do amount to probable cause. Accordingly, police had probable cause to search Arnold's vehicle for drugs before the traffic stop was initiated.

Because the officers had probable cause before pulling Arnold over, the automobile exception justifies JNET's stop and search of Arnold's trunk. *Ross*, 456 U.S. at 809. Under the automobile exception, police are entitled to search "every part of the vehicle and all containers found therein in which contraband could be hidden," *United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991), which in this case, includes the trunk. Therefore, because police had probable cause at the time of the initial stop, the entire stop and search of Arnold's trunk was constitutionally permissible under the automobile exception and his motion to suppress was properly denied.

Given the constitutionality of the trunk search, Arnold's motion to suppress evidence seized from Truman's house also lacks merit. The firearm and drug contraband were seized from Truman's apartment under a valid search warrant. The probable cause for this search warrant was based on the drugs legally seized from Arnold's trunk. Because the trunk search was constitutional, any later discovered evidence is not considered fruit of the poisonous tree and is admissible. *Cf. Wong Sun v. United States*, 371 U.S. 471 (1963).

**V.**

The district court's denial of Arnold's motion to suppress is **AFFIRMED**.