NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0353n.06

No. 17-5865

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Jul 16, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| DANNY NEAL STOKES, | ) | |
| | ) | **OPINION** |
| **Defendant-Appellant.** | ) | |
| | ) | |

Before: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Defendant-Appellant Danny Stokes asks this court to reverse the district court's denial of his motion to suppress methamphetamine and cash discovered in his truck following a traffic stop motivated by a known informant's tip. Because we conclude that there was probable cause to search the truck, we **AFFIRM**.

## I. BACKGROUND

The roots of Danny Stokes's arrest lie two months earlier, in the May 15, 2015, arrest of his eventual co-defendant Howell Dean O'Bryan. R. 13 (Indictment at 1) (Page ID #55). O'Bryan, arrested with a pound of methamphetamine and three guns, agreed to cooperate with police and thus began trying to arrange to resell the drugs. R. 54 (Suppression Hr'g Tr. at 4–6) (Page ID #177–79). He was successful: a third future co-defendant, Jordan Dale Wallace, arranged to meet him to buy the pound of methamphetamine. *Id.* at 6–7 (Page ID #179–80). Wallace was subsequently arrested. *See id.*

The officers responsible for Stokes's arrest knew all this late at night on July 25, 2015, when O'Bryan got back in touch. *Id.* at 7–8 (Page ID #180–81). This time, O'Bryan told them that he had seen Stokes at Kentucky Downs (a horse track) with six ounces of methamphetamine and over $100,000. *Id.* at 7–8, 51 (Page ID #180–81, 224). O'Bryan also apparently said that Stokes was driving a blue Ford pickup truck. *Id.* at 41 (Page ID #214); Appellant's Br. at 13; Reply Br. at 4–5. The officer who received this call shared the information with the rest of the team, R. 54 (Suppression Hr'g Tr. at 7–8, 51) (Page ID #180–81, 224), and officers then watched Stokes as he left the racetrack in his blue Ford pickup, stopped at a Denny's restaurant, and continued on Kentucky 100 between Franklin and Russellville, *id.* at 8–10, 13 (Page ID #181–83, 186). But they did not want to stop Stokes outright and tell him why they suspected he had drugs with him, because that would compromise O'Bryan's assistance. *Id.* at 11, 29 (Page ID #184, 202). Instead, they waited until Stokes drifted over the white fog line on the side of the road and pulled him over on that pretext. *Id.* at 10–12, 39 (Page ID #183–85, 212).

The two officers who pulled Stokes over approached his vehicle, and one of them—Officer Duvall—began to conduct an ordinary late-night traffic stop, with all the usual questions and verifications. *Id.* at 14–15 (Page ID #187–88). The traffic stop itself, however, turned up no evidence of criminal activity. *Id.* at 32 (Page ID #205). So at the end of these routine checks, Office Duvall simply issued Stokes a "courtesy notice." Video at 10:35–10:40.

Though that was the end of any traffic-related investigation, it was not the end of Stokes's night. The other officer with Officer Duvall, Deputy Hargett, was a trained K-9 officer who had

brought his drug-sniffing dog, Gunner, with him. R. 54 (Suppression Hr'g Tr. at 14, 43) (Page ID #187, 216). Gunner had remained inside the police vehicle while Officer Duvall conducted the routine traffic stop. *Id.* But after Office Duvall handed Stokes the courtesy notice, the two officers began to investigate for drugs more directly. First, Officer Duvall asked Stokes if it would "be OK" if they searched the truck. Video at 11:05–11:10. Stokes said no. *Id.* Then, believing that they nevertheless had grounds to continue detaining Stokes, Officer Duvall asked Stokes to exit the truck, and Deputy Hargett deployed Gunner. R. 54 (Suppression Hr'g Tr. at 11, 15–16, 29, 35–36) (Page ID #184, 188–89, 202, 208–09). Gunner then indicated the presence of drugs, and Deputy Hargett ventured inside the vehicle (still without Stokes's consent) to investigate further. *Id.* at 39 (Page ID #212); Video at 14:00–14:30, 15:30–18:30. Deputy Hargett discovered roughly six ounces of methamphetamine and $184,000 in cash. R. 54 (Suppression Hr'g Tr. at 16–17) (Page ID #189–90).

Stokes moved in the district court to suppress the evidence that the officers found, arguing that it was obtained through a seizure and search that "was warrantless, not consensual, and not made with probable cause." R. 41 (Mot. to Suppress at 1) (Page ID #131). The Government did not dispute the first two of those three claims, but it argued that the officers had probable cause stemming from O'Bryan's tip. R. 68 (Gov't's Post-Hr'g Br. at 13) (Page ID #271). Magistrate Judge Brennenstuhl agreed with the Government, R. 70 (Findings of Fact, Conclusions of Law and Recommendation at 19) (Page ID #293), and Judge Stivers adopted Judge Brennenstuhl's

findings, conclusions, and recommendation in full, R. 78 (Dist. Ct. Op. & Order at 5) (Page ID

#342).[1]  Stokes now appeals.

## II.  DISCUSSION

As all seem to agree, *see* Appellee's Br. at 9; Reply Br. at 3, this case hinges on whether

(1) O'Bryan's tip and (2) the police officers' subsequent corroboration of its details provided

probable cause to search Stokes's truck.[2]  For the reasons that follow, we conclude that there was

probable cause and thus **AFFIRM**.

---

[1]One other piece of this story is worth noting briefly:  At Stokes's suppression hearing, the Government called only one witness—Officer Duvall—who repeatedly disclaimed any ability to speak to Gunner's drug-detecting qualifications.  R. 54 (Suppression Hr'g Tr. at 37) (Page ID #210) ("I can't testify to the dog's training or actions."); *id.* ("I don't know how they are trained. I can't answer that question."); *id.* at 39 (Page ID #212) ("I'm not the K-9 handler.  You would have to speak to Deputy Hargett as to his training and experience in how his K-9 is trained."). Judge Brennenstuhl accordingly found that the Government "was on notice that it would have to support" Gunner's qualifications from Stokes's motion, that "[i]t failed to do so," and that the Government had therefore "failed to demonstrate that the alert from Gunner constituted probable cause for the vehicle search.").  R. 70 (Findings of Fact, Conclusions of Law and Recommendation at 16) (Page ID #290).  Judge Stivers adopted that finding as well, and he overruled the Government's request to supplement the record with evidence of Gunner's reliability and training. R. 78 (Dist. Ct. Op. & Order at 4–5 & n.1) (Page ID #341–42).

[2]That is because, if the tip did not provide probable cause, the Government would have to rely on Gunner's findings to justify the search.  The Government does not entirely abandon this argument, *see* Appellee's Br. at 18–22, but it is not a winnable one.  If the tip offered less than reasonable suspicion, then the officers had no lawful authority to extend the traffic stop beyond its normal scope in order to deploy Gunner.  *See Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015).  And if the tip offered reasonable suspicion but less than probable cause, the Government would still have to show why the district court clearly erred in finding that Gunner's reliability was unestablished.  *See United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994); R. 78 (Dist. Ct. Op. & Order at 4–5 & n.1) (Page ID #341–42).  Given Officer Duvall's repeated attestations that he could not speak to Gunner's credentials (raising the question why the Government did not call Deputy Hargett, even if a continuance was necessary), R. 54 (Suppression Hr'g Tr. at 37, 39) (Page

## A. Standard of Review

"In an appeal of the denial of a motion to suppress, we review a district court's factual findings for clear error and its legal determinations *de novo*." *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009). The existence of probable cause qualifies under this rubric as a legal determination. *Id.* "Where, as here, the district court has denied a motion to suppress, we review the evidence in a light most favorable to the Government." *United States v. Akridge*, 346 F.3d 618, 622–23 (6th Cir. 2003).

## B. Governing Law

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend IV. Although this traditionally means that police must obtain a warrant in order to conduct a search, "[u]nder the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998). In other words, "[a]n automobile search is not 'unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.'" *United States v. Arnold*, 442 F. App'x 207, 210 (6th Cir. 2011) (quoting *United States v. Ross*, 456 U.S. 798, 809 (1982)).

---

ID #210, 212), it is hard to see how we could be "left with the definite and firm conviction that" the district court blundered, *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

"Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Lumpkin*, 159 F.3d at 986 (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998)). It "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 230, 232 (1983). We assess the existence of probable cause through a totality-of-the-circumstances analysis. *See id.* at 233; *Lumpkin*, 159 F.3d at 987.

"Probable cause may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers." *Lumpkin*, 159 F.3d at 986. The Supreme Court's guidance regarding the fluidity of probable cause is especially apt in this context, given that "[i]nformants' tips . . . come in many shapes and sizes from many different types of persons." *See Gates*, 462 U.S. at 232. In analyzing the totality of the circumstances in this context, we therefore recognize that "a deficiency in one [relevant consideration] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. We have also conceived of this exercise as involving a "sliding scale" that runs between less reliable tips (such as those come from anonymous sources) and more reliable tips (such as those that come "from known or reliable informants"). *United States v. Williams*, 483 F. App'x 21, 25 (6th Cir. 2012).

## C. Probable Cause to Search Stokes's Truck

Here, the totality of the circumstances reveals enough to get the Government over the goal line, though perhaps not with a lot of breathing room. First, O'Bryan was a known informant.

That means that O'Bryan "would [have been] subject to prosecution for making a false report," and thus that his statements are "entitled to far greater weight than those of an anonymous source." *United States v. May*, 399 F.3d 817, 824–25 (6th Cir. 2005); *see also, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 270 (2000) ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." (citations and quotation marks omitted)). That is one factor in the Government's favor—and a major distinction between this case and cases like *J.L.* (which Stokes cites, *see* Appellant's Br. at 12; Reply Br. at 4) that instead featured anonymous tips.

Second, O'Bryan had been reliable before. *Cf., e.g.*, *United States v. Martin*, 526 F.3d 926, 937 (6th Cir. 2008) (affidavit's statement "that the confidential informant in the present case is a known person who . . . previously provided information that resulted in seizure of illegal controlled substances . . . is sufficient to establish the informant's reliability"); *May*, 399 F.3d at 824 (finding reliability where informant had "furnished information . . . for a period of six months" and "ha[d] provided assistance in unrelated drug investigation cases" (quoting affidavit)). Here, as Stokes points out, O'Bryan's track record was not lengthy: it was limited to arranging the buy with Wallace two months prior. But as Stokes concedes, our cases disclose "no minimum number of times that an informant must cooperate before his tips can be credited." Reply Br. at 3. And indeed, our cases suggest that while more is certainly better than less, *see, e.g.*, *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc) (assistance over five years); *United States v.*

*Helton*, 314 F.3d 812, 821 (6th Cir. 2003) (assistance leading to "three searches and sixteen arrests"), the probative difference between zero and one is more significant than the probative difference between, say, five and six. *Compare Martin*, 526 F.3d at 937 (finding reliability where affidavit offered only general statement regarding known informant's past assistance); *United States v. Moore*, 661 F.3d 309, 313 (6th Cir. 2011) (finding reliability where "CI had given information in the past that had led to two drug seizures"), *with United States v. Neal*, 577 F. App'x 434, 444 (6th Cir. 2014) (finding lack of reliability in the case of a previously untested informant); *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (finding lack of reliability in the absence of any indication that anonymous informants had provided reliable information before); *United States v. Hammond*, 351 F.3d 765, 772 (6th Cir. 2003) (finding lack of reliability in the absence of any indication that *named* informant had provided reliable information before). In short, O'Bryan's previous assistance counts in the Government's favor in the totality of the circumstances—not as much, of course, as if he had provided five years of reliable tips, *see, e.g.*, *Allen*, 211 F.3d at 976, but appreciably more than if he had been entirely untested.

Third, O'Bryan reported personally seeing the methamphetamine (and money) in Stokes's possession. *Compare, e.g.*, *Moore*, 661 F.3d at 312–13 (collecting cases demonstrating probative value of informant's having seen defendant with contraband); *Dyer*, 580 F.3d at 391 ("Here, the affidavit asserted that the informant witnessed a drug transaction in the basement of the place to be searched, noted that there was a pool table in the room, stated the exact amount of cash and methamphetamine exchanged, and observed that a large quantity of methamphetamine remained

after the sale."), *with Frazier*, 423 F.3d at 532 ("What is more, [none of the informants] witnessed Frazier dealing drugs from . . . the premises specified in the search warrant."). And while O'Bryan's specificity regarding the amount of drugs and currency does not add a tremendous amount of weight, *see Neal*, 577 F. App'x at 443 ("By relying primarily on the level of detail provided in statements to *assess* their reliability, courts are apt to mistake the best storytellers for the most truthful informants."), we nevertheless note that it provided marginally more reliability than a vague report of criminality or contraband, *see, e.g.*, *Hammond*, 351 F.3d at 773; *United States v. Weaver*, 99 F.3d 1372, 1378 & n.4 (6th Cir. 1996).

Fourth, the police did corroborate the information that O'Bryan supplied: that Stokes was at Kentucky Downs in a blue Ford pickup at a particular time. Make no mistake, these were relatively easy to know (and innocuous) facts, and the simple fact that police were able to corroborate them does not itself establish probable cause under our precedents. *See, e.g.*, *Hammond*, 351 F.3d at 773. But as already discussed, the point of our totality-of-the-circumstances analysis is that strengths can balance weaknesses, *see Gates*, 462 U.S. at 233, and therefore "substantial independent police corroboration" is not necessary when other hallmarks of reliability exist to a sufficient degree, *see Dyer*, 580 F.3d at 392; *Frazier*, 423 F.3d at 532; *see also Allen*, 211 F.3d at 976. Here, the details that O'Bryan provided and the officers' corroboration of those details help to get the Government to the permissible side of the probable-cause divide, even though the value of this input, standing alone, is low.

### III.  CONCLUSION

Undoubtedly, an even more reliable tip would make this case easier.  But we review probable-cause cases as we find them, using a realistic, holistic approach.  Because the police had probable cause to search Stokes's truck, we **AFFIRM**.