NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0367n.06

Case No. 21-1457

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 09, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) | |
| FHARIS DENANE SMITH, | ) | |
| Defendant-Appellant. | ) | OPINION |
| _____/ | ) | |

Before: GUY, MOORE, and CLAY, Circuit Judges.

GUY, J., announced the judgment and delivered the opinion of the court as to the issue discussed in Part III, in which MOORE and CLAY, JJ., joined. CLAY, J. (pp. 21–32), delivered a separate opinion concurring in Part III of the lead opinion, and delivered the opinion of the court, in which MOORE, J., joined, as to the issues discussed in Parts A and B, of his opinion. MOORE, J. (pp. 33–36), delivered a separate opinion concurring in part and in the judgment of the lead opinion.

**RALPH B. GUY, JR., Circuit Judge.** This case presents two questions. First, may the police, armed with a warrant, search the digital contents of a cell phone for evidence about a fatal shooting when the warrant affidavit recounts (among other facts) that a "known" informant and "multiple" anonymous sources reported the names of two gunmen who "fired guns at the deceased" and the cell phone that is searched belongs to one of the alleged shooters? Second, we must decide whether evidence about a defendant's welfare benefits application is improper evidence of prior "bad acts" under Federal Rule of Evidence 404(b). In the end, we affirm the district court's judgment.

I.

A.

On April 18, 2020, police officers with the City of Kalamazoo were tasked with locating and arresting defendant Fharis Smith on an outstanding warrant. (R. 91, PgID 603, 601, 624-25, 627). At around 4:00 p.m., officers observed Smith drive a white vehicle to a gas station. (*Id.*, PgID 603, 667-68). A green sport-utility vehicle arrived and parked near Smith. (*Id.*, PgID 669). Smith walked to the passenger side of the green vehicle, opened the door, leaned into the vehicle for "[j]ust a few seconds," and then leaned back out of the vehicle and talked for a moment with the driver. (*Id.*, PgID 670). Although the undercover officer watching Smith from inside the store did not see drugs or money exchange hands, the officer suspected a drug transaction had occurred based upon her training and experience. (*Id.*, PgID 667, 671, 684). When other officers arrived to arrest Smith, they saw Smith alone in the white vehicle sitting in the driver's seat. (*Id.*, PgID 604). The officers suspected he was concealing or retrieving a firearm when they saw him reach down near his feet. (*Id.*, 604-05).

The officers arrested Smith and found $2,340 in Smith's pants pocket and a loaded, semi-automatic pistol between Smith's feet. (*Id.*, PgID 605, 610). In the vehicle, officers also found four rounds of ammunition, 2.61 grams of methamphetamine, a digital scale with white residue, and two cell phones. (*Id.*, PgID 629-30, 697; PgID 632-34, 636). During the arrest, one of the cell phones rang and Smith asked to answer it, but the officers did not permit him to do so. (*Id.*, PgID 615-16, 639).

That evening, a detective with Kalamazoo police sought a warrant to search Smith's two cell phones. (R. 44-2, PgID 146-47). In the supporting affidavit, the detective stated that he was

investigating a shooting that occurred on April 11, 2020, at a specific address in Kalamazoo where three victims were shot, one of whom was killed. (*Id.*, PgID 146).

The detective's affidavit further provided the following information: (1) "*a source who is known* but who has requested anonymity at this time" told Kalamazoo police "that both Dauntrell Walker and Fharis Smith were present at the scene of the shooting and that they both fired guns at the deceased"; (2) "*multiple sources advised*" Kalamazoo police that Walker and Smith "had been present at, and involved in, this shooting"; (3) "[i]nvestigators also received information that a person who had been shooting at [the deceased] may also have sustained *a gun-shot wound* during the incident"; (4) Walker and Smith "are known by [the detective] to be involved in weapon possession and violent acts within the City of Kalamazoo on a historical and an ongoing basis"; (5) when "Walker and Smith were arrested by Kalamazoo [police]" on April 18, 2020, "both were in possession of loaded firearms" and "Smith was also in possession of two mobile communication devices"; and (6) on Walker's lower back, there was "a fresh wound" that was "consistent with a *gunshot wound*." (*Id.*, PgID 147 (emphasis added)). The affidavit noted: "These facts corroborate the information given by the source who has requested anonymity." *Id.*

Having been an officer for fifteen years, the detective explained in the affidavit that he "knows through training and experience that people involved in criminal activity regularly employ their mobile electronic devices in the planning, the commission, or the concealment of crime and that they will document criminal activity through photographs, text messages, and other electronic data contained within and accessed by such devices." (*Id.*, PgID 146-47). The detective also stated that he has "employed facts obtained from such devices in the successful prosecution of violent criminals." *Id.*

Accordingly, the detective's affidavit stated that he believed a search of Smith's cell phones would yield evidence "about who was at the scene and how events unfolded" and could also "show whether Smith possessed a firearm or communicated with anyone about his involvement" in the shooting. (*Id.*, PgID 147). A state court judge found probable cause for the search and issued a search warrant. (*Id.*, PgID 145).

On one of Smith's phones, officers found text messages involving drug dealing activity. (R. 92, PgID 732-36, 832-40). In one message exchange on the day of Smith's arrest, Smith and another individual arranged to meet that day at a gas station. The other individual stated, "[I] will be there in about 10 to 15 minutes . . . driving a green truck and . . . need $100 worth." The individual also sent messages with travel updates.

Smith moved to suppress the text messages on the basis that the search warrant was issued without probable cause. After oral argument, Smith's motion was denied because, as the district court explained, "the warrant was lawfully issued" by the state court judge and, even if it was not, the officers could rely on the warrant in good faith under *United States v. Leon*, 468 U.S. 897 (1984). At Smith's trial for drug and firearm convictions, the messages were admitted into evidence.

B.

At trial, Smith sought to preclude testimony from a welfare benefits specialist with the Michigan Department of Health and Human Services. The government proffered that it planned to call the specialist to introduce into evidence a welfare benefits application Smith submitted roughly three months before he was arrested—claiming that "he was unemployed, had no assets, [and had] no money in the bank." (R. 91, PgID 505, 691). The government also explained that

the specialist would testify that Smith never reported a change in his circumstances, even though he was under a continuing obligation to do so under the terms of the application. *Id.*

Before the specialist testified, Smith "objected on equal protection grounds" and also argued that the testimony is "irrelevant." (*Id.*, PgID 505, 689-91). The government responded that the testimony supports the inference that the $2,340 found in Smith's pocket when he was arrested was not from lawful employment. (*Id.*, PgID 505-06, 691-92). The district court agreed and overruled Smith's objection, reasoning that the specialist's testimony "is relevant to the issue of the source of the money." (*Id.*, PgID 506-507, 692). Consistent with the government's proffer, the specialist testified at trial and Smith's welfare application was admitted into evidence without further objection from Smith.

The jury found Smith guilty of the three crimes charged in the indictment: (1) felon in possession of a firearm, 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), (b)(1)(C); and (3) possession of a firearm in furtherance of drug trafficking, 18 U.S.C. § 924(c)(1)(A)(i). The district court sentenced Smith to a total of 138 months in prison and three years of supervised release.

This appeal followed.

## II.

*Cell Phone Search.* Before the government may search a cell phone, "a warrant is generally required . . ., even when a cell phone is seized incident to arrest." *Riley v. California*, 573 U.S. 373, 401 (2014). "In the absence of a warrant, [the] search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.* at 382; *see also id.* at 391, 401-02 (identifying "exigent circumstances" as an exception that could apply). Here, the government does not contest that a search warrant was required.

A valid warrant under the Fourth Amendment "require[s] only three things": (1) it must be issued by a "neutral, disinterested" magistrate or judge; (2) "those seeking the warrant must demonstrate to the magistrate [or judge] their probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense"; and (3) the warrant "must particularly describe the 'things to be seized,' as well as the place to be searched." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (cleaned up). It is only the probable-cause requirement that Smith contends is not satisfied here.

There is probable cause for a search when "the totality of the circumstances" presented in a warrant affidavit would lead a "person of reasonable caution" to believe there is a "fair probability" that "contraband or evidence of a crime" will be found in a particular place. *Florida v. Harris*, 568 U.S. 237, 243-44 (2013) (cleaned up); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). In other words, there must be a probable cause "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (citation omitted); *see also Wyoming v. Houghton*, 526 U.S. 295, 302 (1999); *Warden v. Hayden*, 387 U.S. 294, 307 (1967).

The probable cause inquiry requires a "flexible, all-things-considered approach"—"turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Harris*, 568 U.S. at 243 (citation omitted). It is a "practical, nontechnical" question based on "common-sense conclusions about human behavior." *Gates*, 462 U.S. at 230-31 (citations omitted). "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

When we review the denial of a motion to suppress evidence, we "must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818,

822 (6th Cir. 1998) (en banc); *accord United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015). Our duty as "a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for concluding' that probable cause existed." *Gates*, 462 U.S. at 238-39 (cleaned up). The Supreme Court has "emphasized that courts should pay 'great deference' to [the issuing] judge's determination of probable cause," in contrast to probable cause determinations in "the warrantless searches and seizures . . . considered in *Ornelas v. United States*, 517 U.S. 690 (1996)." *McLane Co. v. EEOC*, 137 S. Ct. 1159, 1169 (2017) (quoting *Gates*, 462 U.S. at 236).

Because the state judge found probable cause to issue a search warrant, we "do not write on a blank slate" and we are "not permitted to attempt a de novo review of probable cause." *United States v. Christian*, 925 F.3d 305, 311-12 (6th Cir. 2019) (en banc) (cleaned up) (quoting *United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018)). Instead, we may "overturn [the issuing judge's] decision only 'if the [judge] arbitrarily exercised his or her authority.'" *Id.* (quoting *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013)).

A.

In arguing that the warrant affidavit did not show probable cause to search his cell phones for evidence related to the April 11 shooting, Smith's contention is twofold: The affidavit does not contain sufficient information corroborating the statements from the known informant and the multiple anonymous informants, and the affidavit does not provide a nexus between his cell phones and the shooting. (Appellant Br. 24-26).

*Corroboration.* As for the corroboration required, "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report," but the Supreme Court has instructed that these considerations are not "entirely separate and independent requirements to be rigidly exacted in every case." *Gates*, 462 U.S. at 230. Rather, "a deficiency

in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233; *see also United States v. Hines*, 885 F.3d 919, 925 (6th Cir. 2018); *United States v. Miller*, 314 F.3d 265, 268 (6th Cir. 2002). Probable cause indeed can be founded on informants' tips of "many shapes and sizes from many different types of persons." *Gates*, 462 U.S. at 232.

Here, the affidavit recounted information from a "known" (albeit unnamed) informant, as well as other anonymous informants. "[T]here is no requirement that an informant be named either in the affidavit or the search warrant." *United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006). "A person known to the affiant officer, even though not named in the affidavit, is not 'an anonymous informant' in the sense referred to in cases where the identity of the informant is known to no one." *United States v. May*, 399 F.3d 817, 825 (6th Cir. 2005). Thus, in this case, "the statements of [the one] informant, whose identity was known to the police and who would be subject to prosecution for making a false report, are thus entitled to far greater weight than those of an anonymous source." *United States v. Dyer*, 580 F.3d 386, 391 (6th Cir. 2009) (quoting *May*, 580 F.3d at 824-25).

This court's en banc decision in *Allen* also made clear that "police need not always independently corroborate a [confidential informant]'s information." *United States v. Smith*, 510 F.3d 641, 652-53 (6th Cir. 2007) (citing *United States v. Allen*, 211 F.3d 970, 972, 974 (6th Cir. 2000) (en banc)); *see, e.g.*, *Brown*, 732 F.3d at 574; *United States v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005). "So long as an issuing judge is 'informed of some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was credible, or his information reliable,' an affidavit is sufficient to support a finding of probable

cause." *May*, 399 F.3d at 824 (quoting *Aguilar v. Texas*, 378 U.S. 108, 114 (1964)); *see also Gates*, 462 U.S. at 244-45.

"The additional evidence substantiating an informant's reliability . . . may be any set of facts that support the accuracy of the information supplied by the informant," including an officer's first-hand observations or investigation, other confidential informants providing the same information, or the informant's reliability in prior investigations. *May*, 399 F.3d at 824 (discussing *Jones v. United States*, 362 U.S. 257, 271-72 (1960)). And while "not dispositive, a defendant's criminal history is also relevant to the probable cause inquiry" and serves as "other indica of reliability for the informant's tip." *Dyer*, 580 F.3d at 393 (citations omitted); *see also Christian*, 925 F.3d at 311; *Hines*, 885 F.3d at 926.

In this case, the government argues that three forms of information in the warrant affidavit corroborate the known informant's statement (also in the affidavit) that Smith and Walker "were present at the scene of the shooting and that they both fired guns at the deceased." (R. 44-2, PgID 147). First, "multiple sources" reported the same information to Kalamazoo police officers, *id.*, indicating that the tip is likely accurate. *Jones*, 362 U.S. at 269, 271; *Christian*, 925 F.3d at 311; *United States v. Crawford*, 943 F.3d 297, 307 (6th Cir. 2019); *United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004) ("A tip from a second informant can also help corroborate information from a confidential informant.").

Second, investigators received information that one of the alleged shooters may have sustained a gunshot wound. Later police learned that information was likely credible because, when police arrested Walker seven days after the shooting occurred, police *personally* observed a "fresh" gunshot wound on Walker's lower back. (R. 44-2, PgID 147). This was also independent police corroboration. And when "an informant is right about some things, he is more probably

right about other facts, including the claim regarding [the suspects'] illegal activity." *Gates*, 462 U.S. at 244 (citation omitted); *accord Hines*, 885 F.3d at 925.

Third, both Smith and Walker possessed loaded guns when they were arrested, and the detective *personally* knew both suspects "to be involved in weapon possession and violent acts within the City of Kalamazoo on a historical and an ongoing basis." (R. 44-2, PgID 147). These facts "made the charge against [Smith and Walker] much less subject to scepticism than would be such a charge against one without such a history." *Jones*, 362 U.S. at 271; *see also Christian*, 925 F.3d at 311; *May*, 399 F.3d at 824.

Put all the circumstances together and it would no doubt seem that "'corroboration through [these] other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay'" of the informants' information. *Gates*, 462 U.S. at 244-45 (cleaned up) (quoting *Jones*, 362 U.S. at 269, 271).

Smith's argument to the contrary is thin. He merely criticizes the fact that the affidavit does not name the confidential informant or state that the individual personally witnessed the shooting. (Appellant Br. 25). But "we have not required informants personally to observe contraband or criminal activity before a court may find probable cause based on an informant's statement," *Crawford*, 943 F.3d at 308, and, as stated, police are not required to name the informant.

More importantly, however, the "totality-of-the-circumstances test 'precludes [Smith's] sort of divide-and-conquer analysis.'" *Wesby*, 138 S. Ct. at 588 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). The fact is "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.*

Our en banc decisions echo that admonition: An affidavit must be judged "holistically [on] what the affidavit does show, instead of focusing on what the affidavit does not contain, or the flaws of each individual component of the affidavit." *Christian*, 925 F.3d at 312; *see also Allen*, 211 F.3d at 975 (instructing that the "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added"). We do not engage in "'hypertechnical, . . . line-by-line scrutiny,' of the affidavit" because that practice has been "explicitly forbidden by the Supreme Court." *Christian*, 925 F.3d at 311 (cleaned up) (citing *Gates*, 462 U.S. at 235-36, 245 & n.14). And an affidavit is "not required to use magic words, nor does what is obvious in context need to be spelled out." *Allen*, 211 F.3d at 975; *accord Christian*, 925 F.3d at 310.

*Nexus*. It is now long-settled that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (citation omitted). "The issuing judge or magistrate 'may give considerable weight to the conclusion of experienced law enforcement officers regarding *where evidence of a crime is likely to be found* and is entitled to draw reasonable inferences about *where evidence is likely to be kept*.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 644 (6th Cir. 2003) (emphasis added) (quoting *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)). In turn, we "must give 'due weight' to factual inferences drawn by resident judges and local law enforcement officers." *Arvizu*, 534 U.S. at 273-74 (citation omitted)).

In the context of a warrant issued to search a residence, this court has held that the issuing judge "may infer a nexus between a suspect and his residence, depending upon 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the

evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (quoting *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985)).

Sometimes it is only the training and experience of an officer or common sense that has supplied the necessary nexus. For instance, we have recognized that "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (quoting *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998)). Thus, a judge "may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking," *Williams*, 544 F.3d at 687 (collecting cases), and that is true even "with *no facts* indicating that the defendant was dealing drugs from his residence," *Sumlin*, 956 F.3d at 886-87 (quoting *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018)) (collecting cases); *see also United States v. Gunter*, 551 F.3d 472, 481 (6th Cir. 2009).

And we have accepted that "individuals who own guns keep them at their homes." *Peffer v. Stephens*, 880 F.3d 256, 271 (6th Cir. 2018) (quoting *United States v. Smith*, 182 F.3d 473, 480 (6th Cir. 1999)). Thus, "a suspect's use of a gun in the commission of a crime is sufficient to find a nexus between the gun that was used and the suspect's residence." *Id.* (collecting cases); *see also Williams*, 544 F.3d at 688 (collecting cases).

We have also declared that "child pornography crimes are 'generally carried out in the secrecy of the home.'" *United States v. Kinison*, 710 F.3d 678, 684 (6th Cir. 2013) (quoting *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009)) (collecting cases); *see, e.g.*, *Peffer*, 880 F.3d at 271 (collecting cases). Thus, a nexus may be inferred between child pornography crimes and a suspect's home, "even though the affidavit [does] not contain direct evidence the child

pornography was accessed at home." *Id.* (citing *United States v. Terry*, 522 F.3d 645, 647 (6th Cir. 2008)).

Do these principles support a nexus between the shooting and Smith's cell phones? On the one hand, Smith suggests that we should jettison any inferred nexus because he maintains that a nexus exists only if an affidavit affirmatively states that a suspect used a cell phone "at the shooting." (Appellant Br. 25-26). The premise of his argument is that "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house." *Riley*, 573 U.S. at 398; (Appellant Br. 18, 20-21).

This court has assessed a cell phone warrant in only a few cases (none of which are mentioned by the parties). *Bass* had no difficulty concluding that a nexus existed between the criminal activity and the defendant's cell phone because the affidavit stated that the defendant "and his co-conspirators frequently used cell phones to communicate" in perpetrating identity theft, and it noted that the defendant was using the cell phone in question "when officers seized it incident to his arrest." *United States v. Bass*, 785 F.3d at 1043, 1046, 1049 (6th Cir. 2015). *Sims* explained that probable cause exists when "the phone itself is being used in connection with an offense or commonly used by someone committing the offense," and that standard was easily satisfied given that the affidavit stated that in one month the defendant had used his phone to make "over 200 calls . . . to and from others known to be involved in the cocaine organization." *United States v. Sims*, 508 F. App'x 452, 460 (6th Cir. 2012). And *Merriweather* was decided on *Leon* good-faith grounds. *United States v. Merriweather*, 728 F. App'x 498, 505 (6th Cir. 2018). There, the affidavit stated that: "a criminal informant (CI) had twice completed a controlled purchase of oxymorphone from [the defendant]"; "both controlled purchases were organized through cell phone communication (*between the CI and [defendant]'s co-defendant*, Lloyd Montgomery)"—

not cell phone communication with the defendant; the cell phone at issue was found in the defendant's car, along with "what appeared to be four oxymorphone pills and cocaine rocks"; and "the affiant stated that in his training and experience, drug dealers use cell phones to coordinate with conspirators, customers, and suppliers." *Id*. (emphasis added). Acknowledging that these facts did "not directly implicate [*defendant*]'s cell phone," *Merriweather* nevertheless concluded that "an officer could reasonably infer" that defendant's phone was used in criminal activity because "it seem[ed] obvious there is a good chance [defendant] at times used his cell phone to carry out the goals of this distribution conspiracy." *Id.* While these cases suggest what is sufficient to establish a nexus to a cell phone, they in no way set the floor for what is required.

On the other hand, the government contends that a nexus to a cell phone may be inferred when the crime involves the "concerted activity" of at least two suspects, *and* a 15-year officer states in the warrant affidavit that he "knows through training and experience that people involved in criminal activity regularly employ their mobile electronic devices in the planning, the commission, or the concealment of crime." (R. 44-2, PgID 147); (Appellee Br. 15-16).

As a practical matter, the Supreme Court has observed that cell phones are "a pervasive and insistent part of daily life" and that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *Riley*, 573 U.S. at 385, 401. *Riley* was careful to emphasize that its "holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest." *Id.* at 401.

The police sought and obtained a warrant in this case. Given that Smith and Walker "both fired guns at the deceased," it seems a judge could reasonably infer that there is a fair probability

that Smith and Walker used their cell phones to communicate, at some time, about some aspect of the shooting because that is how people in our modern society generally communicate when they do anything together. (R. 44-2, PgID 147). After all, probable cause "does not deal with hard certainties"; it "deal[s] with probabilities" based on "common-sense conclusions about human behavior." *Gates*, 462 U.S. at 231 (citations omitted); *see also Messerschmidt v. Millender*, 565 U.S. 535, 552 n.7 (2012); *Rodriguez-Suazo*, 346 F.3d at 644.

But we elect to not decide whether the state judge arbitrarily found probable cause to issue the warrant. *See, e.g.*, *Leon*, 468 U.S. at 925; *United States v. Baker*, 976 F.3d 636, 648 (6th Cir. 2020). With the above probable cause principles as a backdrop, we conclude this case qualifies for the good-faith exception under *Leon.*

B.

*Good-faith Exception.* The district court was correct to deny Smith's suppression motion because the officers searched Smith's phones "in objectively reasonable reliance" on the search warrant. *Leon*, 468 U.S. at 922. But Smith failed to challenge this conclusion in his initial brief on appeal. "Time, time, and time again, we have reminded litigants that we will treat an 'argument' as 'forfeited when it was not raised in the opening brief.'" *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (cleaned up); *see also United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006). Even so, Smith's belated arguments in his reply brief are unavailing.

Under the "judicially created" "exclusionary rule," "improperly obtained evidence" is inadmissible at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009); *see also Davis v. United States*, 564 U.S. 229, 238 (2011). "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges." *Davis*, 564 U.S. at 246 (quoting *Leon*, 468 U.S. at 916). But the exclusionary rule is "applicable only . . . where its deterrence benefits outweigh its

substantial social costs." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (cleaned up); *accord Utah v. Strieff*, 579 U.S. 232, 237 (2016). Hence, "exclusion 'has always been [the] last resort, not [the] first impulse.'" *Herring*, 555 U.S. at 140 (quoting *Hudson*, 547 U.S. at 591).

As relevant here, the Supreme Court has also created the so-called "good-faith exception" to the exclusionary rule. *Leon*, 468 U.S. at 923-24; *accord Davis*, 564 U.S. at 240, 248. Under the exception, "the exclusionary rule does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid," or when the police "conduct involves only simple, 'isolated' negligence." *Davis*, 564 U.S. at 238-39 (citations omitted). A court's "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n.23). "These circumstances frequently include a particular officer's knowledge and experience, but that does not make the test any more subjective than the one for probable cause, which looks to an officer's knowledge and experience, but not his subjective intent." *Id.* at 145-46 (cleaned up).

Smith argues the good-faith exception does not apply due to the same affidavit deficiencies that he contends invalidate the warrant. (Reply Br. 10). But even if a "Fourth Amendment violation occurred," the "exclusion of evidence does not automatically follow." *Davis*, 564 U.S. at 244; *see also Herring*, 555 U.S at 137. Far more is required to extinguish the good-faith exception. *Christian*, 925 F.3d at 313; *Carpenter*, 360 F.3d at 595-96. *Leon* identified four egregious situations in which the good-faith exception would not apply. 468 U.S. at 923; *Hines*, 885 F.3d at 926-27. But only one situation is remotely relevant here: The warrant must be "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Messerschmidt*, 565 U.S. at 547 (quoting *Leon*, 468 U.S. at 923). This

describes a "bare bones," "conclusory affidavit," which "states only the affiant's belief that probable cause existed." *Christian*, 925 F.3d at 313 (citation omitted).

The bar for establishing that standard "is a high one, and it should be." *Messerschmidt*, 565 U.S. at 547. For the cost of exclusion to "pay its way," *Davis*, 564 U.S. at 238 (citation omitted), the police conduct must involve "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights," or there must be evidence of "'recurring or systemic negligence' on the part of law enforcement." *Id.* at 238, 240 (quoting *Herring*, 555 U.S. at 144).

No police conduct here even begins to approximate those labels, not least because there is no binding precedent dictating that this search warrant violated the Fourth Amendment. *See id.* at 240, 249. Nor can it be said that the police submitted a "conclusory," "bare bones" affidavit devoid of *any* factual allegations for probable cause or "*some* connection, regardless of how remote," between the illegal activity and the place searched. *Christian*, 925 F.3d at 312-13 (citations omitted). The necessary connection may even be based on "reasonable inferences" that would otherwise be insufficient for "probable cause in the first place." *United States v. White*, 874 F.3d 490, 500 (6th Cir. 2017). Even though the affidavit "does not directly implicate [Smith]'s cell phone[s]" in the April 11 shooting, the connection may reasonably be inferred based on the affiant officer's "training and experience," "consistent with common sense." *Merriweather*, 728 F. App'x at 505. Faced with the facts that Smith and Walker "both fired guns at the deceased" (suggesting it was a coordinated attack), Smith possessed a loaded gun and two cell phones when he was arrested, and the affiant officer attested that in his "training and experience" individuals involved in criminal activity regularly use their cell phones to plan or conceal crime, an officer could reasonably infer that Smith's cell phones contained communications with Walker regarding the April 11 shooting. (R. 44-2, PgID 147). In an "ordinary case" like this, "'an officer cannot be

expected to question the [issuing judge]'s probable-cause determination' because 'it is the [judge]'s responsibility to determine whether the officer's allegations establish probable cause.'" *Messerschmidt*, 565 U.S. at 547 (quoting *Leon*, 468 U.S. at 921); *see also Strieff*, 579 U.S. at 240.

Because the warrant affidavit is *not* "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," the search here comes within the good-faith exception and is not properly subject to the exclusionary rule. *Messerschmidt*, 565 U.S. at 547 (quoting *Leon*, 468 U.S. at 923).

## III.

*Evidentiary Ruling.* Smith is also not entitled to relief for the ruling at trial allowing evidence about his Michigan welfare benefits application. Smith stakes his claim on Federal Rule of Evidence 404(b).

Smith's claim is subject to plain-error review because he did not properly preserve it before the district court. *See* Fed. R. Evid. 103(a), (e); Fed. R. Crim. P. 51(b); *United States v. Montgomery*, 998 F.3d 693, 698 (6th Cir. 2021). Recall that Smith objected to the evidence of his welfare application as "irrelevant" and also improper on "equal protection grounds."

He never asserted "the specific ground" that he now cites. *See* Fed. R. Evid. 103(a)(1)(B). Nor can we say that Smith's argument "was apparent from the context," *id.*, because he also failed to argue that the "probative value of the evidence is substantially outweighed by its potential prejudicial effect," and the government never argued the evidence was admissible under Rule 404(b). *See United States v. Haywood*, 280 F.3d 715, 720, 725 (6th Cir. 2002) (quoting *United States v. Johnson*, 27 F.3d 1186, 1191 (6th Cir. 1994)). Thus, Smith's reliance on *Haywood* is misplaced. With too many missing pieces, Smith's "objection is not sufficiently specific" to alert

the district court that it was called upon to apply the Rule 404(b) framework, and so we review Smith's Rule 404(b) argument for plain error. *United States v. Blood*, 435 F.3d 612, 625 (6th Cir. 2006); *see also Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005); *United States v. Cox*, 957 F.2d 264, 267 (6th Cir. 1992).

Rule 404(b) states: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Evidence is admissible under the rule if: (1) "there is sufficient evidence that the other act in question actually occurred"; (2) "the evidence of the other act is probative of a material issue other than character"; and (3) "the probative value of the evidence is substantially outweighed by its potential prejudicial effect." *United States v. Jackson*, 918 F.3d 467, 483 (6th Cir. 2019) (quoting *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003)).

Smith contends that Rule 404(b) precludes the government's evidence that: three months before Smith's arrest he applied for welfare benefits; Smith's application stated that he was homeless, had no income, and had less than $100 in his bank account; and he did not later report, as required, any changes to his employment or financial status. (R. 91, PgID 505, 691; R. 92, PgID 712, 715, 719). But that argument is hollow.

All the elements for admissibility are met here. First, Smith does not contend there was insufficient evidence that he applied for welfare benefits and never updated his application. It is also not clear what Smith views as the "bad act" in this scenario. *Old Chief v. United States*, 519 U.S. 172, 180-82 (1997). Second, the evidence was probative in bolstering the inference that the $2,340 found in Smith's pocket when he was arrested was drug distribution proceeds and not from lawful employment.

As to the third element, it is telling that Smith has again made no attempt to argue that the potential prejudicial effect *substantially outweighs* the probative value of the evidence. *Jackson*, 918 F.3d at 483; Fed. R. Evid. 403. Any argument would be futile in this case, especially given that "we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Chambers*, 441 F.3d 438, 456 (6th Cir. 2006) (citation omitted). And "the prejudice to be weighed is the *unfair* prejudice caused by admission of the evidence. Evidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial pursuant to Rule 403." *Id.* (citation omitted); *see also United States v. LaVictor*, 848 F.3d 428, 447-48 (6th Cir. 2017); *United States v. Sims*, 708 F.3d 832, 836 (6th Cir. 2013).

Smith has not shown that the district court erred, much less committed plain error. *See Greer v. United States*, 141 S. Ct. 2090, 2096-97 (2021).

\* \* \*

The judgment is AFFIRMED.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** I concur in the holding of the lead opinion that the district court did not err in admitting evidence of the welfare application under Rule 404(b) of the Federal Rules of Evidence. But because I agree with Judge Moore that the affidavit in support of the search warrant for Defendant's cell phone failed to make the requisite showing of probable cause to support the search, the majority's view is that the search was illegal. And because I believe that the good faith exception does not save the unlawful search, I dissent from the remainder of the lead opinion.

## BACKGROUND

### Factual Background

On April 20, 2020, a criminal complaint was filed against Defendant Smith, alleging a violation of the felon in possession of a firearm statute pursuant to 18 U.S.C. § 922(g)(1). The affiant, Theodore Westra, a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, reviewed the facts said to support a probable cause determination. According to Westra's testimony provided at a preliminary hearing, Smith came to the attention of the Kalamazoo Department of Public Safety ("KDPS") during an investigation into an April 11, 2020 shooting, in which three victims were shot, one of whom was killed. For reasons not clear on the record, Smith became a person of interest in the shooting investigation, and a criminal history search revealed an outstanding warrant for his arrest for a misdemeanor offense of malicious destruction of property. KDPS "put out a be-on-the-lookout to all patrol officers" to locate and arrest Smith on this unrelated misdemeanor warrant as a part of their investigation into the April 11 shooting. (Tr. of Prelim. Hr'g, R. 36, PageID ## 70–71).

On April 17, 2020, officers followed Smith from Kalamazoo to a Battle Creek rental car center, where Smith rented a white GMC Yukon XL. On April 18, in Kalamazoo, KDPS agents

continued surveillance of Smith and saw him drive a white Yukon XL into a gas station parking lot. After Smith's arrival, a green SUV parked near the Yukon. Officers observed Smith get out of his vehicle, walk to, and open the passenger side door of the green SUV, and lean in toward where the driver was seated before leaning back out of the vehicle and shutting the door. "[O]fficers concluded that this contact was consistent with a drug transaction." (Gov't Trial Br., R. 43, PageID # 117).

At this point, KDPS Sergeant Justin Wolbrink and Officer Brett Bylsma drove into the gas station and positioned their patrol vehicles in front of the Yukon; another KDPS officer parked behind Smith's car. Officer Bylsma observed Smith "bend forward and reach his right arm down toward the floorboard area of the car, near his feet." (Compl., R. 1, PageID # 3). Sergeant Wolbrink ordered Smith to put his hands up, Smith complied, and Officer Bylsma took Smith into custody. As he did so, Officer Bylsma saw "the grip of a black pistol between [Smith's] feet." (*Id.*). The weapon, a semi-automatic pistol, was loaded with eleven rounds of ammunition, with one round in the chamber. A records check indicated that the firearm was reported stolen to KDPS on January 6, 2020.

During a search incident to arrest, officers found two cell phones; $2,340 in Smith's pants pocket; 2.61 grams of suspected crystal methamphetamine in the pocket of the driver's side door; a functioning digital scale with white residue, which later tested positive for methamphetamine; and four additional rounds of ammunition found hidden inside a cigarette box in the SUV's console. (Tr. of Prelim. Hr'g, R. 36m PageID # 75 ("This, in my training and experience, would lead me to believe that Mr. Smith is a distributor[.]")).

Later that day, on April 18, 2020, a warrant was issued authorizing a search of Smith's cell phones, though officers were able to search only one of the phones. The affidavit in support of the

warrant seeking information relating to the April 11, 2020 shooting, read as follows: "Any content

or data which may establish elements of the crimes of homicide, assault with a dangerous weapon,

or weapon possession." (Aff., R. 44-2, PageID # 146). The affidavit continues:

> Following the initial investigation, Kalamazoo police obtained information *from a source who is known but who has requested anonymity* at this time. This source advised that both Dauntrell Walker and [Defendant] Fharis Smith were present at the scene of the shooting and that they both fired guns at the deceased, Londrell Cook.
>
> During the initial stages of the investigation, *multiple sources* advised Kalamazoo Police officers that Dauntrell Walker and Fharis Smith had been present at, and involved in, this shooting.
>
> Investigators also received information that a person who had been shooting at Cook may also have sustained a gun-shot wound during the incident.
>
> Dauntrell Walker and Fharis Smith are known by your affiant to be involved in weapon possession and violent acts within the City of Kalamazoo on a historical and an ongoing basis.
>
> On 18 April 2020, Walker and Smith were arrested by Kalamazoo Public Safety officers. At the time of their arrests, both were in possession of loaded firearms. Smith was also in possession of two mobile [phones]. . . . Following his arrest, a fresh wound was located on Walker's lower back. Walker claimed that the wound was a stab wound [but the affiant believed it was] consistent with a gunshot wound[.]
>
> These facts corroborate the information given by the source who has requested anonymity. . . . By searching the contents of Fharis Smith's mobile devices, affiant believes . . . there could be information on the phone . . . that would show whether Smith possessed a firearm or communicated with anyone about his involvement in this matter.

(*Id.* at PageID # 147 (emphases added)).

## Procedural History

On May 19, 2020, a grand jury indicted Smith as a felon in possession of a firearm, in

violation of 18 U.S.C. § 922(g)(1), § 924(a)(2); possession with intent to distribute

methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and possession of a firearm in

furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Defendant filed a

motion to suppress the data obtained from his cell phone, which the district court denied. It held

that the warrant was lawfully issued and backed by probable cause. The court held that even if the

affidavit was deficient, the officers could have nevertheless relied on the warrant in good faith. The case proceeded to a jury trial, and the jury returned a verdict of guilty.[1] Smith's timely appeal followed.

## DISCUSSION

### Standard of Review

"Federal constitutional law applies to a state search warrant that is challenged in federal court." *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022) (citing another source). When reviewing a district court's denial of a motion to suppress, this Court "consider[s] the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc). This Court examines the district court's legal conclusions *de novo* but defers to the district court's factual findings unless they are clearly erroneous. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004).

### Analysis

The Fourth Amendment prescribes that "no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV. To show that probable cause supports a search warrant, the officer "must submit an affidavit that 'indicate[s] a fair probability that evidence of a crime will be located on the premises [or, in this case, cell phone] of the proposed search.'" *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (quoting another source).

---

[1] During the trial, the government called an eligibility specialist from the Michigan Department of Health and Human Services to testify about Smith's source of income. The testimony indicated that in January 2020, Smith applied for and was approved for $194 monthly welfare assistance, but his eligibility was contingent on an obligation to report all changes to his financial situation within ten days. The government sought to introduce this evidence to imply that the money officers had seized from Smith at the time of his arrest ($2,340) was ill-gotten, such as the proceeds from an illegal drug sale, since Smith never reported receipt of this sum to the welfare agency.

Defendant makes two arguments on appeal. First, he asks this Court to reverse the district court's denial of the motion to suppress because the affidavit lacked probable cause and failed to set forth corroborative efforts to assure the reliability of the unnamed informants' tips. Second, Smith argues that the district court erred in permitting the prosecution to have a witness testify concerning Defendant's application for welfare benefits, in violation of Federal Rule of Evidence 404(b). Although the lead opinion correctly finds no error in the district court's admission of the testimony on Smith's welfare application, the evidence obtained from Smith's cell phone should have been suppressed because the warrant affidavit failed to establish the existence of probable cause and is not saved by the good-faith exception.

## A. The Finding of Probable Cause

First of all, a proper analysis of the affidavit does not lead to a finding of probable cause. When, as in this case, a search warrant affidavit relies on information provided by unnamed or anonymous individuals, this Court considers the "totality of the circumstances" test, set forth by the Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 234 (1983), to determine whether "the magistrate had a substantial basis for concluding probable cause existed," *United States v. Howard*, 632 F. App'x 795, 799 (6th Cir. 2015). When confronted with hearsay information,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238. Accordingly, "when a warrant is issued based on information provided by an informant, our review under the totality of the circumstances must consider the informant's 'veracity, reliability, and basis of knowledge' to determine 'whether an affidavit is sufficient to support a finding of probable cause." *United States v. Neal*, 577 F. App'x 434, 440 (6th Cir. 2014)

(citing another source).  These indicia of the informant's credibility provide a general framework for assessing whether an informant's tip creates probable cause, *United States v. Helton*, 314 F.3d 812, 818–20 (6th Cir. 2003), but they should not be viewed "as entirely separate and independent requirements to be rigidly exacted in every case." *Gates*, 462 U.S. at 230, 233 (internal quotation marks omitted).

"[R]egardless [of] how an informant fares in this framework, 'corroboration through other sources of information' can provide 'a substantial basis for crediting' an informant's tip." *Howard*, 632 F. App'x at 799 (quoting *Gates*, 462 U.S. at 233–34); *cf. United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008) ("[N]amed informants, unlike confidential informants, require little corroboration.").

In this case, the relevant language from the affidavit is as follows: "Kalamazoo police obtained information from a source who is known," and "multiple sources advised Kalamazoo Police Officers that . . . Smith had been present at, and involved in [the April 11, 2020] shooting." (Aff., R. 44-2, PageID # 147).  A review of the totality of the circumstances establishes that the affidavit fails to establish the veracity, reliability, and basis of knowledge of the unnamed and anonymous tips. *Helton*, 35 F.4th at 519.

To start, the affidavit in the instant case fails to show the veracity of the anonymous tipster's statements. *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (quoting *Gates*, 462 U.S. at 229) ("'Veracity' involves the credibility of the informant[.]").  It fails to say "how[] the source was known to law enforcement or that the source's identity was provided to the judge." *Helton*, 35 F.4th at 519.  Moreover, nothing in the affidavit suggested the informant's past reliability or that the informant had personal knowledge that criminal activity by Smith was afoot. *See Smith*, 182 F.3d at 477 (explaining "reliability" involves assessing the dependability "of the

informant's report"). Our precedent fails to support an affiant's unsupported assertion that an informant was reliable, particularly where, as in this case, the informant's identity was not disclosed to the judge reviewing the warrant application:

> [W]here the affidavit does not aver facts showing the relationship between the affiant and the informant, or detail the affiant's knowledge regarding the informant providing prior reliable tips that relate to the same type of crimes as the current tip concerns, this Court has generally found that other indicia of reliability must be present to substantiate the informant's statements.

*Neal*, 577 F. App'x at 441 (citing another source). Even though the affidavit states the informant was "known," it makes no effort to establish that the informant has provided reliable information to the police in the past, which cuts against a finding of reliability. *Cf. United States v. May*, 399 F.3d 817, 823–24 (6th Cir. 2005) (finding informant to be "known" where source "ha[d] furnished information . . . for a period of six months and has worked with [the officer] in the investigation of th[e] matter").

Furthermore, the affidavit fails to set forth the informant's basis of knowledge, i.e., "the particular means by which an informant obtained his information." *Smith*, 182 F.3d at 477 (citing *Gates*, 462 U.S. at 228). Instead, the affidavit baldly asserts, "Dauntrell Walker and Fharis Smith had been present at, and involved in, this shooting." (Aff., R. 44-2, PageID # 147). This statement does nothing to establish the basis of knowledge of the informants, such as indicating that the source witnessed Smith shoot the gunshot victims. *Cf. United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009) ("Because the informant witnessed the illegal activity on the premises searched and was known to the officer writing the affidavit, there were sufficient indicia of reliability without substantial independent police corroboration."); *see also United States v. Parker*, 4 F. App'x 282, 286 (6th Cir. 2001) (Clay, J., dissenting) ("The affidavit . . . failed to indicate . . . that the informant had observed any evidence of illegal sales on the premises, or had

reason to believe that the illegal activity was continuing[.]"). The affidavit does not establish how the unknown informants came by the information in this case; the contention that "multiple sources" are alleged to have incriminated Smith in the shooting does not bolster the tips' believability given the anonymous nature of the sources and the absence of other indicia of reliability. *Cf. United States v. Woosley*, 361 F.3d 924, 927–28 (6th Cir. 2004) (finding affidavit sufficient where officer previously received information from other informants regarding drug activities at defendant's business location and other officers had previously received similar tips).

On balance, it appears that the affidavit lacked sufficient detail to establish probable cause even under the totality of the circumstances. But the absence of reliability, veracity, and basis of knowledge does not end the inquiry; an affidavit that fails to establish these three elements might nevertheless "support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *Id.* at 927; *Howard*, 632 F. App'x at 804 (citing another source) ("What an informant and her tip lack in intrinsic indicia of credibility, however, police must make up for in corroboration."). The affidavit in the present case fails to establish corroboration of the information provided by the unnamed informants. The primary piece of purportedly corroborating evidence related not to Smith but to the other subject of the search warrant, Dauntrell Walker. The affidavit stated that the presence of "a fresh wound . . . located on Walker's lower back . . . . corroborate[s] the information given by the source who has requested anonymity." (Aff., R. 44-2, PageID # 147). Contrary to the lead opinion, it is not entirely clear how the presence of a wound on Walker's back connects Smith to the homicide.

It also strains believability to assert, as the lead opinion does, that the presence of a firearm in Smith's vehicle corroborates the assertions by the unnamed and anonymous sources. If that assertion were to be believed, anyone found with a firearm might be thought to have shot the

victims on April 11, 2020. The affidavit also states that Smith and Walker are "known . . . to be involved in weapon possession and violent acts [in Kalamazoo] on a historical and an ongoing basis." (Aff., R. 44-2, PageID # 147). One might ask, "Known by whom?" These general allusions to "involvement" in "weapon possession and violent acts" do not implicate Smith in the April 11 homicide. All said, this affidavit contains inadequate information that law enforcement undertook the necessary steps for independent corroboration, which dooms it under a probable cause assessment since other indicia of reliability are absent. *See Woosley*, 361 F.3d at 927 ("[A]n affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information."). For these reasons, there was not a substantial basis for concluding that probable cause existed because the circumstances indicate a lack of reliability, veracity, and basis of knowledge of the unnamed and anonymous tips, and the facts fall short of establishing any sufficient police corroboration.

### B. Nexus

Second, to be valid, a search warrant application must show more than just that "the owner of the property is suspected of [a] crime;" it must also instead establish that "there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).

In this case, the thrust of the affiant's attempt to establish such a nexus was "that people involved in criminal activity regularly employ their mobile electronic devices in the planning, the commission, or the concealment of crime." (Aff., R. 44-2, PageID # 147). Without more, the information cannot establish a nexus between the thing to be searched (Smith's cell phone) and the evidence sought (involvement in a homicide). This finding is particularly apt since the only

evidence in the affidavit linking the homicide to Smith's cell phone was based on anonymous complaints and an unnamed source lacking indicia of dependability, without any adequate corroboration. *See United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008) (quoting another source) ("When[] . . . the only evidence of a connection between illegal activity and the residence is unreliable, such as uncorroborated statements by a confidential informant, then a warrant may not issue allowing the search of the residence.").

Indeed, this Court has "never held . . . that a suspect's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) (quoting another source). It stands to reason that a suspect's apparent status as a drug dealer also would not give rise to a fair probability that he was involved in a homicide. *United States v. Griffith*, 867 F.3d 1265, 1274 (D.C. Cir. 2017) ("Because a cell phone, unlike drugs or other contraband, is not inherently illegal, there must be reason to believe that a phone may contain evidence of the crime.").

This case is unlike *United States v. Bass*, 785 F. 3d 1043, 1049 (6th Cir. 2015), where a nexus existed between the cell phone and allegations of identity theft because "the affidavit stated that Bass and his co-conspirators frequently used cell phones to communicate." Conversely, in this case, the affiant purportedly relied on nothing more than conjecture that whoever shot the victims on April 11 might have had a cellphone at the shooting, communicated via cellphone at the time, or took pictures on a phone that would place them on the scene. *Cf. United States v. Sims*, 508 F. App'x 452, 460 (6th Cir. 2012) (finding warrant backed by probable cause where affidavit set forth "many facts . . . that the phone was used in the drug conspiracy and that [defendant] was using it"). Accordingly, the affidavit fails to connect the item to be searched to the crime alleged,

so it cannot justify a search, and without a nexus, there is no probable cause. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005).

## C. The Good Faith Exception

Third, and finally, the good faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984) does not save the fruits of this otherwise illegal search. *United States v. Ronnie Bugger*, 529 F. App'x 482, 846 (6th Cir. 2013) ("The affidavit, which did not provide the 'substantial basis' necessary for a finding of probable cause, also fails to provide even a 'minimally sufficient nexus' that would justify application of the good-faith exception."); *see also United States v. Reed*, 993 F.3d 441, 455 (Clay, J., dissenting) ("[The good faith exception is not intended to have the untoward consequence of disincentivizing courts from enforcing the probable cause requirement[.]"). While there is no evidence that the affiant included false information or that the magistrate failed "to act in a neutral and detached fashion," official reliance on the warrant to support the search of Smith's cell phone was not "objectively reasonable." *United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006); *see also United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006) (finding affidavit "so bare bones as to preclude application of the good-faith exception"). Otherwise put, "no reasonable officer would afford much weight to the anonymous [and unnamed] statements" since those statements "were sparse in relevant detail; and, most importantly, they were not corroborated in any meaningful manner." *Helton*, 3214 F. 3d at 824; *United States v. Leake*, 998 F.2d 1359, 1367 (6th Cir. 1993) ("We . . . conclude that Officer Murphy could not properly have placed objective good faith reliance on the warrant in light of his knowledge that corroboration was needed"). The lack of a nexus between the criminal activity alleged (a homicide) and Defendant's cell phone rendered reliance on the warrant objectively unreasonable and the good faith exception inapplicable. *Brown*, 828 F.3d at 385–36 ("Although

the good-faith standard is less demanding than the standard for probable cause, the affidavit still must draw some plausible connection to the [place to be searched].").  For these reasons, the good faith exception would not apply to save the fruits of an illegal search.  I would find the district court erred in failing to suppress the evidence from the cell phone.

## CONCLUSION

In sum, I concur in the lead opinion's holding that the district court did not err in admitting the testimony concerning the welfare application, consistent with Rule 404(b) of the Federal Rules of Evidence.  However, I would reverse the district court's denial of Defendant's motion to suppress the evidence obtained according to the warrant.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** Although the lead opinion purportedly "elect[s] to not decide" whether probable cause supported the warrant at issue in this case, many pages of the opinion are devoted to an argument that nonetheless endorses the issuing state-court judge's probable-cause finding. Lead Op. at 15. I agree with Judge Clay that the sources mentioned in the affidavit are insufficiently corroborated and that no factual allegations contained in the affidavit connect the crime at issue here to the contents of Smith's cell phone. I therefore do not join the dicta in the lead opinion insinuating that probable cause supported the warrant issued in this case, but instead I join parts A and B of Judge Clay's opinion, making that the majority on those issues.

I conclude, however, that the good-faith exception to the Fourth Amendment's exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 922 (1984), applies under this court's precedent. To address the preservation issue first, I agree with the lead opinion that Smith forfeited the good-faith exception issue on appeal. Even though the district court explicitly found that the good-faith exception applied as an alternative to its finding of probable cause, R. 90 (Suppression Hr'g Tr. at 30–31) (Page ID #492–93), Smith failed to address this finding until his reply brief. We generally consider such a failure to constitute forfeiture, *see United States v. Galaviz,* 645 F.3d 347, 362 (6th Cir. 2011), yet it is unclear whether the government raised adequately a forfeiture argument in this case. *See United States v. Turner*, 602 F.3d 778, 783 (6th Cir. 2010). The government did note Smith's failure to address the good-faith argument in his opening brief, but it did not argue that the failure constituted forfeiture or offer any cases in support. We have likewise considered as forfeiture the failure sufficiently to develop arguments. *See United States v. Johnson,* 440 F.3d 832, 846 (6th Cir. 2006).

In any case, the government prevails on the merits. Under the good-faith exception, evidence that the police obtains in violation of the Fourth Amendment is not excluded when an officer's reliance on a warrant is objectively reasonable. *Leon*, 468 U.S. at 922. *Leon* listed four instances in which a warrant could still be excluded notwithstanding the good-faith exception. *Id.* at 923. At issue here is one of those circumstances, that "the warrant was 'so lacking in indicia of probable cause' as to render official belief in its existence unreasonable." *United States v. Helton*, 35 F.4th 511, 521 (6th Cir. 2022) (quoting *United States v. McClain*, 444 F.3d 556, 564–65 (6th Cir. 2005)). A so-called "bare-bones" affidavit does not provide any indicia of probable cause and gives rise to such an unreasonable belief. *Id.* In short, presented with a bare-bones affidavit, an "officer recklessly relie[s] on the judge's decision that probable cause existed for the warrant." *United States v. Reed*, 993 F.3d 441, 450 (6th Cir. 2021).

This court has interpreted the good-faith standard (a standard that is just as much "judicially created," Lead Op. at 15, as the exclusionary rule) to be a high bar to clear. *See United States v. Christian*, 925 F.3d 305, 312–13 (6th Cir. 2019) (en banc). If "some modicum of evidence, however slight," connects the criminal activity and the item searched, we do not consider the affidavit to be bare-bones. *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) (quoting *United States v. Laughton*, 409 F.3d 744, 749 (6th Cir. 2005)). Relevant to this case, "[a] bare-bones affidavit should not be confused with one that lacks probable cause." *Id.* Rather, some "daylight" separates the requirements for a warrant supported by probable cause—one that contains a "substantial basis" for a judge's conclusion—and a warrant that avoids the "bare-bones" moniker—one that is not "so vague as to be conclusory or meaningless." *Id.* at 497, 500 (quotations omitted).

The search warrant in this case falls within that daylight. Although the facts contained in the search warrant are not corroborated enough to establish probable cause, the tips "provide some support" that Smith was involved in the shooting. *Helton*, 35 F.4th at 522. When combined with the "minor inference" that Walker's gunshot wound made it more likely that Walker (and consequently, Smith) was present at the scene, some "modicum of evidence" supported the warrant. *White*, 874 F.3d at 497. Given that a more-than-bare-bones affidavit is one that "contains factual allegations, not just suspicions or conclusions," one cannot say that the affidavit was bare-bones with respect to the allegations that Smith was involved in the shooting. *Christian*, 925 F.3d at 313.

Whether the affidavit provided "some support" for a nexus between Smith's cell phone and evidence of the crime presents a closer question. *Helton*, 35 F.4th at 522. Ultimately, however, I recognize that the affidavit specified *some* remote connection between the contents of Smith's cell phone and the shooting. *Christian*, 925 F.3d at 313. The affidavit supporting the warrant described a shooting involving two suspects and contained the testimony of an officer who believed that relevant information would be found on one of the suspects' cell phones based on "training and experience." R. 44-2 (Aff. for Search Warrant) (Page ID #147). An officer relying on the warrant could reasonably believe that a judge relied on those allegations to find a connection between the cell phone and the shooting. In light of the allegations connecting Smith to the shooting, moreover, such reliance could not be considered reckless. *See Reed*, 993 F.3d at 450.

To be sure, an issuing magistrate would have to make some large inferential leaps to conclude that probable cause existed to support this warrant. For example, the state-court judge who issued the warrant would have had to infer that Smith and Walker planned or communicated about the shooting merely because they were both allegedly present at the scene of the crime. But

"[t]his circuit's holdings indicate that a nexus between the place to be searched and the item to be seized may sometimes be inferred." *United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009). This court continues to grapple, moreover, with the permissible scope of those nexus-supporting inferences. Even when faced with no evidence connecting a crime to a suspect's residence, for instance, this court has been "pulled" in "both directions" when inferring a link between the suspect and the suspect's home. *Reed*, 993 F.3d at 447. One cannot expect a reasonable officer to recognize a lack of probable cause to support an evidentiary nexus if some members of this court are unable to do so. *See id.* at 452.

The breadth of a rule allowing the government to search an arrestee's cell phone as long as two people are allegedly involved in a crime concerns me as much as it concerns Judge Clay. In this case, however, I cannot conclude that the affidavit was "so lacking in indicia of probable cause that no reasonable officer would rely on the warrant." *Helton*, 35 F.4th at 522 (quoting *White*, 874 F.3d at 496). I therefore concur in the lead opinion's judgment that the good-faith exception applies.[1]

---

[1] I likewise concur in Part III of the lead opinion.